CITY OF BOSTON

v.

Carla HILLS, Secretary of United States Department of Housing and Urban Development, et al.

Civ. A. No. 75–902–C.

United States District Court, D. Massachusetts.

Sept. 30, 1976.

Thomas H. Martin, Mason & Martin, Boston, Mass., for plaintiff.

James N. Gabriel, U. S. Atty., William Hughes, Asst. U. S. Atty., Boston, Mass., for defendant.

## MEMORANDUM

CAFFREY, Chief Judge.

### I. PRIOR PROCEEDINGS

This action was originally filed by the plaintiff, the City of Boston (the City) against Carla Hills, the Secretary of the Department of Housing and Urban Development (HUD) and others, on March 10, 1975. In its original complaint the City sought injunctive and declaratory relief and relief in the nature of mandamus from the operation of a regulation of HUD, 24 C.F.R. 403.1 *et seq.*, which the City contends was invalid, which authorized HUD to exercise exclusive control over the level of rents to be set in units in "federally insured and subsidized" housing projects.[1]

On April 18, 1975, after a hearing, this Court denied the plaintiff's motion for a preliminary injunction, holding that: (1) the plaintiff had not shown that it was in danger of suffering immediate and irreparable harm from the continued application of the federal regulation in question in that the federal regulation had not increased the rent of any unit subject to the City's rent control ordinance; and (2) the plaintiff had failed to demonstrate a probability of success on the merits because (a) under the circumstances of the case, the federal regulation under attack was validly promulgated under the applicable provisions of the Administrative Procedure Act, 5 U.S.C.A. 553(d)(3); and (b) it was not likely that the plaintiff could show that the regulation was beyond the authority of the Secretary to promulgate.

On October 22, 1975, HUD further amended 24 C.F.R. by adding a new part

1. Pursuant to the National Housing Act (the Act, the United States, through HUD and HUD's subsidiary, the Federal Housing Administration, offers programs of assistance and subsidy to encourage the construction of privately-owned rental housing. Certain of said programs are known as "subsidized insured programs." Subsidized insured programs receive subsidies and other assistance in one of several forms. Only the following three forms are relevant to the instant controversy: (a) interest reduction payments pursuant to § 236 of the Act (12 U.S.C. 1715z–1, *et seq.*) ("the 236 program"); (b) below-market interest rates pursuant to § 221(d)(3) of the Act (12 U.S.C. 1715*l*[d][3]) ("the 221[d][3] below-market-interest-rate program" or 221[d][3] BMIR program"); and (c) direct loans at below-market interest rates pursuant to § 202 of the Act of 1959 (12 U.S.C. 1701q) ("the 202 program"). A fourth program, the so-called "Rent Supplement Program," 12 U.S.C. 1701s, authorizes the Secretary of HUD to make and contract to make annual payments to a "housing owner" on behalf of "qualified tenants" to permit eligible low income individuals and families to afford the rentals in the three programs described above.

403.1 which clarified HUD's authority to set rents in federally-insured and subsidized housing free from state or local rent control ordinances or regulations. Thereafter the plaintiff submitted a Substitute Complaint to reflect the promulgation of the amendments to part 403.1. The City contests the validity of 24 C.F.R. 403.1 *et seq.*, as amended, and seeks a declaration from this Court of its right to regulate rents in housing constructed under the subsidized insured programs as part of its imposition of rent control generally upon housing in the City.

On July 16, 1976, HUD moved to add the Rent Board of the City of Boston (the Rent Board) as a party plaintiff pursuant to Rule 19, F.R.Civ.P., and for leave to amend its answer for the purpose of filing a counterclaim pursuant to Rules 13(e) and 15(d), F.R.Civ.P. It appearing that neither motion is opposed, an Order will enter allowing HUD's motion for leave to amend its answer and allowing HUD's motion to add the Rent Board of the City of Boston as a party plaintiff. HUD has also moved for summary judgment.

HUD's proposed counterclaim brought pursuant to 28 U.S.C. 2201 and 2202, seeks a declaration that the City of Boston Ordinances, Ch. 19 (1972), as amended, violate the Supremacy Clause, Article VI, Clause 2, of the United States Constitution. Additionally, HUD seeks to enjoin the City from regulating the level of rents in federally-insured and subsidized housing projects in Boston. HUD alleges that jurisdiction for its counterclaim lies under 28 U.S.C. §§ 1331 and 1345, that the matter in controversy exceeds $10,000, and that the Secretary of HUD has the capacity to sue pursuant to the National Housing Act, 12 U.S.C. § 1702.

In support of its claim for injunctive relief, HUD contends that it is being irreparably harmed and the public interest adversely affected by the City's action in allegedly preventing mortgagors from collecting the minimum amount of rent determined by HUD to be necessary for the economic viability of federally-insured and subsidized housing projects in Boston. HUD alleges that it has no adequate legal remedy because defaults and foreclosures will result from the plaintiffs' actions and these will result in financial loss to the federal government for which it cannot be fully reimbursed. Additionally, HUD alleges that such foreclosures would terminate the subsidy benefits to tenants which benefits provide displaced and low and middle income families with the opportunity to occupy decent housing.

The issues underlying the instant controversy have been the subject of three state court decisions and one federal district court decision which conflict on the issue of preemption under the Supremacy Clause.

On March 1, 1976, Judge Garrity of the Boston Housing Court ruled that HUD's scheme of rent regulation (1) did not preempt the City's rent control ordinance; and (2) that in *Druker v. Sullivan*, 322 F.Supp. 1126 (D.Mass.1971), Judge Julian ruled as a matter of law that both federal regulations and the City ordinance "may both be enforced without impairing federal superintendence;" and (3) that if the Boston Rent Board "was in violation of federal law or is frustrating the purposes of a federal program, HUD could commence litigation against the Board." *Kargman, et al. v. Boston Rent Control Board, et al.*, Civil Action No. 3085; *Brown, et al. v. Kargman, et al.*, Civil Action No. 4150. In these cases the issues raised were whether HUD's *final* regulation (24 C.F.R. 403.1 as amended) conflicted with the Boston rent control ordinance and whether the authority granted to HUD by Congress was an unconstitutional delegation of legislative authority.

On March 19, 1976, after a consolidated trial in *Druker v. City of Boston et al.*, C.A.No. 71–45–F and *Kargman v. Sullivan et al.*, C.A.No. 71–2712–F,[2] Judge Freedman held that the City of Boston's rent control ordinances do conflict with the federal reg-

---

**2.** The Memorandum of Decision for the consolidated cases is reported at 410 F.Supp. 1314 (D.Mass.1976).

ulations and frustrate the purposes and objects of the National Housing Act and thus violate the Supremacy Clause of the United States Constitution. He accordingly ruled that the orders of the Rent Control Board were invalid as to the plaintiff-project owner's federally-insured and subsidized housing projects.

Subsequently, on July 1, 1976, Judge Daher of the Boston Housing Court in *Rent Board of the City of Boston v. Druker, et al.*, Civil Action No. 3452, in effect held that the federal regulatory scheme embodied in 24 C.F.R. 403.1 *et seq.*, was unconstitutional under the 9th and 10th Amendments to the United States Constitution insofar as it preempted the Commonwealth's substantive law of landlord-tenant relations. The issue as framed by Judge Daher in initially ruling on the motion for injunctive relief was not whether the local ordinance conflicted with the purposes and operation of the federal housing program, as embodied in the National Housing Act, but rather whether HUD's *interim* regulation (now clarified in an amended version of 24 C.F.R. 403.1) conflicted with the Boston rent control ordinance.

Judge Daher's ruling was made on a motion by the defendant-project owners to revoke an injunction which had been issued in the case on July 9, 1975. In granting injunctive relief the Judge had ruled that federally-insured and subsidized housing projects in Boston were subject to the regulations of the Boston Rent Board. Subsequent to granting the injunction, two events occurred which prompted the plaintiff-project owners to move for a revocation of the injunction: (1) the federal regulation in question, 24 C.F.R. 403, was amended; and (2) Judge Freedman, after a trial, ruled in *Druker v. City of Boston et al., supra.*

Judge Daher denied the motion to revoke the injunction notwithstanding the intervening developments cited by the plaintiffs,

thus leaving intact his ruling that rents in federally-insured and subsidized housing in Boston could be validly controlled by the local rent control ordinance, and that the federal regulations at 24 C.F.R. 403.1 *et seq.* to the contrary were invalid.

There is thus a head-on conflict between the decisions of the United States District Court (Freedman, J.) and the decisions of the Housing Court of the City of Boston (Garrity, J. and Daher, J.) as to the question of whether the federal regulatory scheme of rent-setting in federally-insured and subsidized housing, 24 C.F.R. 403.1 *et seq.* preempts Boston's rent control ordinance insofar as it relates to such housing in the matter of rent setting.[3]

A review of the federal statutes, regulations and programs, as well as a review of the state statutes and local ordinances, will indicate more accurately the provisions of the state and federal laws as well as the extent of the conflict between them.

The National Housing Act, 12 U.S.C.A. § 1701, *et seq.* (the Act), enacted in 1934 establishes most of the federally-insured and subsidized housing programs involved in the instant case. Pursuant to Congress' Article I, Section 8 powers (the Commerce and Tax Spend Clauses of the U.S. Constitution), the Act promotes the private construction of housing for individuals and families not otherwise able to afford adequate housing.

The Secretary of HUD, having found that local rent control ordinances are a "significant factor," 40 Fed.Reg. 49319 (October 22, 1975), in causing mortgage defaults, promulgated the regulations in question, 24 C.F.R. 403.1, *et seq.* In so doing she acted pursuant to the authority granted in the Act "to make such rules and regulations as may be necessary to carry out the provisions of this title [Mortgage Insurance]." 12 U.S.C.A. § 1715b; *see also* 42 U.S.C.

---

**3.** The operation of 24 C.F.R. 403.1 *et seq.*, expressly preempts the local regulation of rent-setting and, by implication, affects local ordinances and state law on evictions. Clearly, if, pursuant to 24 C.F.R. 403, a mortgagor receives approval for a rent increase, the rent thereafter charged for the subject unit is a "lawful" rent under the federal regulations. State law on eviction procedure remains applicable, except that the lawfulness of the rent would not be subject to challenge.

§ 3531, *et seq.*; 12 U.S.C. § 1701q; 12 U.S.C. § 1715*l*(d)(3) and (5); and 12 U.S.C. § 1701s.

Effective February 26, 1975, HUD promulgated a proposed regulation, 40 Fed. Reg. 8189, which in essence declared HUD's intention to preempt local rent control ordinances in subsidized insured projects. This regulation was published in final form on October 22, 1975. 40 Fed.Reg. 49318. *See* 24 C.F.R. 403. The new part 403.1 of 24 C.F.R. states in relevant part that:

(b) Any state or local law, ordinance or regulation is without force and effect insofar as it purports to regulate rents of (i) projects for which a determination of preemption has been made pursuant to Subpart B, or (ii) projects coming within the scope of Subpart C or D. Compliance with such law, ordinance or regulation shall not be required as a condition of, or prerequisite to, the remedy of eviction, and any law, ordinance, or regulation which purports to require such compliance is similarly without force and effect.

(c) It is the purpose of the Department that these regulations shall bar all actions of a board that would in any way frustrate the purpose or effect of these regulations or that would in any way delay, prevent or interfere with the implementation of any increase in rental charges approved by HUD.

(d) These regulations may be offered as a defense to a proceeding by whomever initiated, which may be brought against any owner, mortgagor or managing agent of a project subject to these regulations who demands, receives or retains, or seeks to demand, receive or retain, rental charges approved by HUD, or as a basis for declaratory, injunctive or other relief against any person or agency, public or private, who attempts to enforce, or threatens to enforce, any state or local law, ordinance or regulation which is without force and effect by reason of this regulation.

In seeking rental fee increases pursuant to 24 C.F.R. 403.1 *et seq.*, mortgagors of federally-insured and subsidized projects are required, *inter alia*, to comply with the following procedures:

§ 403.10

(a) The mortgagor shall file its application for approval of increases in rental charges with the appropriate local office of HUD

(b) The local HUD office will process the application for increases in rental charges in accordance with HUD's regulations, including Part 401 of this Chapter, and instructions and procedures, all adopted pursuant to the statutory authority described in Section 403.8 and shall notify in writing any board in the area in which the project is located that it is processing the application and, that pursuant to this subpart, HUD has preempted the entire field of rent regulation by a board acting pursuant to state or local law as it affects the project.

(c) The mortgagor may effect collection of the new rents in accordance with the procedures described in Part 401 of this chapter. The mortgagor shall furnish the board a schedule of any new rents approved by HUD within ten (10) days after the approved rents have become effective. Notice to the board of the approved increase in rents does not confer upon the board a right to approve or disapprove the Department's action or to exercise jurisdiction over the implementation of the rent increases by the mortgagor. The sole purpose of the notice is to inform the board of the lawful rents that may be charged for projects covered by this subpart.

In Boston, rents in housing constructed under the subsidized insured programs known as the 202, 221(d)(3) and 236 programs are controlled in accordance with the local rent control scheme.

The plaintiff's memorandum opposing summary judgment, and the affidavit of William Edgerton, establish that at the present time the City of Boston's Rent Board has jurisdiction over rents in approximately 105 housing developments in Boston constructed with federal financial assistance under the 202, 221(d)(3) and 236 pro-

grams. These 105 developments include virtually all of the rental housing in Boston constructed under the federal programs. Those projects contain approximately 12,500 rental units, which constitute about 10 per cent of the total number of residential rental units presently covered by rent control in Boston. Except for practices on the part of the Rent Board which have been developed to conform more closely to practices of HUD, the form of rent control imposed upon rental housing constructed in Boston with federal financial assistance under the 202, 221(d)(3) and 236 programs is substantially identical to the form of rent control imposed in Boston upon privately-owned rental housing generally.

In 1970, the City of Boston enacted Chapter 11 of the Ordinances of 1970 (hereinafter "the 1970 Ordinance") which provided for a form of rent control in Boston. The 1970 ordinance was enacted under authority of Mass.St.1969, c. 797, as amended by Mass.St.1970, c. 863. The 1970 ordinance applied to all rental housing units in Boston subject to exceptions enumerated in § 1(e) thereof, but included privately-owned federally subsidized housing in the so-called 207, 220, 221(d)(3) and 236 programs.

In 1972, the City of Boston accepted Mass.St.1970, c. 842, the statewide local-option rent control legislation. The 1970 ordinance expired of its own terms on December 31, 1972. The City of Boston's acceptance of Mass.St.1970, c. 842, became effective on January 1, 1973. Privately-owned federally subsidized housing is exempted from rent control in such housing.

The City adopted Chapter 19 of the Ordinance of 1972 (hereinafter "the 1972 Ordinance"), also to be effective on January 1, 1973. The 1972 Ordinance provided for a form of rent control applicable only to privately-owned federally subsidized housing under the so-called 202, 207, 220, 221(d)(3) and 236 programs, which programs were exempt from coverage under Mass.St.1970, c. 842. The form of rent control imposed upon privately-owned federally subsidized housing constructed with federal financial assistance under the aforementioned pro-

grams is substantially identical in practice to that imposed upon other privately-owned housing in Boston. The only differences are the statutory authority for rent control and certain local practices intended to conform to practices of HUD.

In 1975, upon the expiration of the 1972 Ordinance, the City enacted Chapter 15 of the Ordinances of 1975 (hereinafter "Chapter 15"). Although this Ordinance made significant changes in the City's rent control scheme (notably by introducing "vacancy decontrol" whereby rental units became decontrolled when vacated), the terms of the 1975 Ordinance do not affect the issues raised by the present litigation.

The matter is now before the Court on the basis of defendants' motion for a preliminary injunction and its motion for summary judgment.

## II. DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION

■ As to the motion for a preliminary injunction, it is settled law that in order to prevail HUD has to show that there is a probability of success on the merits of the litigation. *Tuxworth v. Froehlke*, 449 F.2d 763 (1 Cir. 1971). It must also show that absent injunctive relief it will sustain immediate and irreparable harm. *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113 (1 Cir. 1968). It likewise must establish the lack of an adequate remedy at law. *Celebrity, Inc. v. Trina*, 264 F.2d 956 (1 Cir. 1959).

The application for injunctive relief raises the issue whether Boston's rent control ordinance may be validly applied to privately-owned federally-insured and subsidized housing units in light of HUD's attempt to void all such local laws, ordinances or regulation through the operation of 24 C.F.R. 403.1 *et seq.* Determination of the issues depends upon the resolution of the following questions:

Does Congress have the power to preempt local regulation of rents in federally-insured and subsidized housing, and alternatively, was 24 C.F.R. 403.1 *et seq.* within

HUD's authority to promulgate and was the regulation validly promulgated?[4]

■ An additional consideration in a case of this type is, of course, the public interest. In litigation involving the administration of regulatory statutes designed to promote the public interest, this factor becomes critical. *See Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 104 U.S.App. D.C. 106, 259 F.2d 921, 925 (1958). Where the public interest is at stake, the Supreme Court has indicated that courts may, and frequently do go much farther to give or withhold injunctive relief than when merely private interests are implicated. *Virginia Railway v. Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1936); *See also, Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

The crucial question to be decided on the merits in this case is whether Boston's rent control ordinance is valid under the Supremacy Clause insofar as it applies to federally-insured and subsidized housing.

As the Supreme Court has noted with regard to questions involving the Supremacy Clause

> No simple formula can capture the complexities of this determination; the conflicts which may develop between state and federal action are as varied as the fields to which congressional action may apply.

*Goldstein v. California*, 412 U.S. 546, 561, 93 S.Ct. 2303, 2312, 37 L.Ed.2d 163 (1972).

■ A court's primary function when confronted with a state law challenged as violative of the Supremacy Clause "is to determine whether, under the circumstances of this particular case, [the state] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The plaintiffs have conceded that the Boston rent control ordinance conflicts with

24 C.F.R. 403.1 *et seq.* In view of this concession and in view of the record in this case, the court finds that the defendants will probably prevail in showing that the local ordinance stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as enunciated in the National Housing Act. *Druker v. City of Boston*, 410 F.Supp. 1314 (D.Mass.1976); *See also, Hahn v. Gottlieb*, 430 F.2d 1243 (1 Cir. 1970).

Notwithstanding their concession on the issue of whether the Boston Rent Control Ordinance conflicts with HUD's regulation, plaintiffs argue that the defendants do not have the *exclusive* authority to control rents on federally-insured and subsidized housing projects because such authority would be beyond Congress' delegated constitutional powers. More particularly, plaintiffs maintain that the Tenth Amendment reserves to them the right to have exclusive control over rents. In spite of the plaintiffs' argument that historically states have exercised exclusive control in the area of landlord-tenant relations, their argument on the Tenth Amendment fails to take cognizance of a line of case authority beginning with the Supreme Court's decision in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1940). *Darby* and other cases under the Tenth Amendment represent a line of authority marked by judicial restraint in reviewing congressional action taken pursuant to delegated powers and aimed at dealing with social problems requiring a national policy. *See e. g., Helvering v. Davis*, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); *National Labor Relations Board v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937); and *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

The general goal of the National Housing Act is to provide "a decent home and a suitable living environment for every American family." 42 U.S.C. §§ 1441, 1441a. To administer this program, the

---

4. The question whether *in fact* Boston's rent control ordinance conflicts with HUD's regulatory scheme is not before this Court in view of

the City's concession (at p. 18 of its brief in opposition to summary judgment) that its ordinance does conflict with 24 C.F.R. 403.1 *et seq.*

statute confers broad discretion on the Secretary of HUD. The Secretary is authorized, *inter alia,* to approve mortgagors and to supervise their operations "under a regulatory agreement or otherwise as to rents, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section." 12 U.S.C.A. § 1715*l* (d)(3).

■ The Act has been subjected to constitutional challenge only once and its constitutionality was upheld. *United States v. Brooks,* 28 F.Supp. 712 (W.D.Wash.1939). On the basis of the record in the instant case and in view of the constitutionality of the Act, this Court rules that the control of rents by HUD is a reasonable condition of Congress' authority to aid in the improvement of housing. The regulation of rents serves a two-fold purpose: (1) the assurance of the continued economic viability of a housing project subsidized with federal monies; and (2) the assurance that the class of persons for whom the housing legislation was enacted will in fact benefit from the legislation. Plaintiffs suggest that a new constitutional trend is emerging, giving greater deference to the states rights argument that the federal government's delegated power is limited by the Tenth Amendment. Plaintiffs place primary reliance upon the recent decision in *National League of Cities, et al. v. Usery,* —— U.S. ——, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), where the Supreme Court held that Congress did not have the constitutional authority to extend the Fair Labor Standards Act so as to prescribe the minimum wages and maximum hours that states could pay and set for their own employees. *National League* is inapposite to the case at bar. In that case the Court was simply recognizing a well-accepted doctrine that the Congress may not regulate actions of the states when such actions are taken in furtherance of the state's *sovereignty. Id.* at ——, 96 S.Ct. 2476. *National League* stands for the narrow principle that the Court will examine and strike down federal enactments directed-to those state determinations which are

"functions essential to [the state's] separate and independent existence." *Id.* In the instant case, 24 C.F.R. 403.1, *et seq.,* has no impact whatsoever on any state determination which is essential to the state's sovereignty. As stated by Justice Rehnquist in *National League, supra,* at ——, 96 S.Ct. at 2469:

Congressional power over areas of private endeavor, even when its exercise may preempt express state law determinations contrary to the result which has commended itself to the collective wisdom of Congress, has been held to be limited only by the requirement that "the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution." [Citation omitted.]

■ Thus I conclude and rule that it is probable that the defendants will prevail on the merits for the following reasons:

1. HUD's regulations, 24 C.F.R. 403.1 *et seq.* are consistent with the underlying statutory authority and, accordingly have the force and effect of federal law. *See, Public Utilities Commission of California v. United States,* 355 U.S. 534, 542, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); and, *Abbott Laboratories v. Gardner,* 387 U.S. 136, 151–152, 87 S.Ct. 1507, 18 L.Ed.2d 681.

2. The promulgation of 24 C.F.R. 404.1 *et seq.* is a necessary and reasonable means of carrying out the Secretary's authority. *See, Sanders v. Federal National Mortgage Ass'n,* 393 F.Supp. 739, 740 (E.D.La.1975); *Hahn v. Gottlieb,* 430 F.2d 1243 (1 Cir. 1970).

3. The Boston Rent Control Ordinance conflicts with 24 C.F.R. 403.1 *et seq.* See plaintiffs' concession of this point at p. 18, Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment.

4. The control of rents in federally-insured and subsidized housing has been preempted by 24 C.F.R. 403.1 *et seq.*

The defendants contend that they will be irreparably harmed, if the Court withholds injunctive relief. The harm, they allege,

would consist of the economic consequences of mortgage defaults and assignments that will result if the Boston Rent Board continues to prohibit the collection of HUD-approved rent increases in federally-insured and subsidized housing.

In support of their motion for injunctive relief, the defendants place principal reliance upon the affidavit of Fred W. Pfaender. The Pfaender affidavit and accompanying documents establish that mortgage defaults and assignments in the subject housing are occurring in Boston at a rate which is three times greater than the national average. (Pfaender Affidavit ¶ 16). When mortgages are assigned HUD must pay insurance benefits to mortgagees equal to the outstanding principal balance of a loan, less 1%. (*Id.* ¶ 4). Payments of these claims is made out of the general insurance fund of the special risk fund, both of which are currently in a deficit position, owing the United States Treasury respectively 2 billion and 1.5 billion dollars. Also outlined in the Pfaender affidavit is the substantial adverse effect on the federal housing programs that the operation and enforcement of the Boston rent control ordinances have had. (*Id.* ¶ 16–19). Those effects are more fully detailed with respect to four HUD-insured projects in Boston in the affidavit of William H. Hernandez, Jr. The Hernandez affidavit establishes that the following HUD-insured projects have encountered financial difficulties due to their inability to collect HUD-approved rents.

a) *Glenville Apartments*, a project insured by HUD under Section 236 of the National Housing Act, 12 U.S.C. 1715z–1. It received a rental increase from the Boston Office during October 1975. The Boston Rent Control Board approved 20% less during February 1976. The project went into default and a deferment of principal payments was granted.

b) *Academy Homes*, a project insured by HUD under Section 221(d)(3). On November 28, 1975, the Boston Area Office approved a rent increase which the Rent Board advised the tenants not to pay. In fact, some tenants had paid the increase in January 1976 and when they were advised by the Rent Board not to pay, they deducted the increase paid in January from the February rents. As a result of this action, the project was forced into default and is in the process of being assigned.

c) *Forest Hills*, a project insured by HUD under Section 221(d)(3). During June 1975, the Boston office approved a rent increase. During September, the Rent Board approved an increase but it was less than the HUD-approved levels. Due to financial difficulties, the project is currently under a two year deferment of principal payments.

d) *Florence Apartments*, a project insured by HUD under Section 221(d)(3). During June 1975, the Boston Office approved a rent increase. During September, the Rent Board approved the same increase, but required it to be implemented in two stages. The second stage of the increase allowed by the Board did not take effect until August 1, 1976. As a result, the project has been under modification and in default. [Hernandez Affidavit, ¶ 22].

In addition to the four projects discussed above, the Hernandez Affidavit cites the history of Castle Square's attempt to implement HUD-approved rent increases and its lack of success. (Hernandez Affidavit, ¶ 18, 20).

The Pfaender and Hernandez affidavits establish that the injury to the public interest caused by foreclosure is and will continue to be irreparable. Foreclosure terminates the below-market interest rate loans available, for example, under the Section 221(d)(3) Program. Such below-market interest rate loans are the mechanisms utilized by the federal government in order to enable landlords to charge lower rentals to low income families. Those lower rental charges provide families with the opportunity to occupy decent housing which they could not otherwise afford. (Pfaender Affidavit, ¶ 2; Hernandez Affidavit, ¶ 21).

Thus, the substantiality of the adverse impact upon tenants which would be caused by defaults and assignments establishes the irreparability of the harm to the national interest in decent low-cost housing that would be caused by denying defendants' motion for injunctive relief.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

 It is axiomatic that a motion for summary judgment should be granted only when all the facts entitling the moving party to judgment are admitted or clearly established. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). *Bromley-Heath Modernization Committee v. Boston Housing Authority*, 459 F.2d 1067 (1 Cir. 1972). I rule that because the City has not conceded that there exists a causal connection between Boston's rent control ordinances and the mortgage foreclosures in federally-insured housing units, that there remains a genuine issue of material fact to be resolved in this case, namely, the issue of the existence *vel non* of that causal relationship. Accordingly, an Order will be entered allowing defendants' motion for preliminary injunction and denying defendants' motion for summary judgment.

Counsel for the defendants are directed to submit to the Clerk of Court a proposed form of Order embodying the preliminary injunction sought.[5]

---

**5.** Subsequent to the preparation of this opinion, an order was entered in the Massachusetts Appeals Court vacating Judge Daher's injunction of July 9, 1975. *Rent Board of Boston v. Druker*, No. 76–0107 C.V., Mass.App.Ct., Aug. 18, 1976.