Lynn ARGO et al., Plaintiffs,

v.

Carla HILLS, Individually and as Secretary of Housing and Urban Development of the United States, et al., Defendants.

No. 76 C 1969.

United States District Court,
E. D. New York.

Jan. 13, 1977.

Rosenstein & Kahn, New York City, for plaintiffs.

David G. Trager, U. S. Atty., E.D.N.Y. by Prosper K. Parkerton, Asst. U. S. Atty., Brooklyn, N.Y., Squadron, Ellenoff & Plesent, W. Bernard Richland, Corp. Counsel, Ellis S. Franke, Gen. Counsel, Conciliation and Appeals Bd., New York City, for defendants.

## OPINION and ORDER

PLATT, District Judge.

This case involves the complex interplay of the New York City rent control laws, the National Housing Act, and the Due Process Clause. It comes before this Court on cross-motions for injunctions to prohibit or order the payment of certain rent increases.

## FACTS

Birchwood Towers #1 and Birchwood Towers #2 ("Birchwood Towers") are multifamily housing projects located in Forest Hills, New York. The plaintiffs in this action are various individual tenants of Birchwood Towers and the Birchwood Towers Tenants Association, Inc. ("Tenants"). The defendants are the owners and operators of Birchwood Towers ("Landlord"), Carla Hills as Secretary of the Department of Housing and Urban Development ("HUD"), the Conciliation and Appeals Board of the City of New York ("CAB") which is authorized to administer the Rent Stabilization Code, and the Housing and Development Administration of the City of New York ("HDA"), which is the agency charged with the administration of the Rent Stabilization Law and with supervising the CAB.

Birchwood Towers is a middle income development built in 1963 which was financed by two mortgages totaling nearly sixteen million dollars. These mortgages were endorsed and guaranteed by HUD pursuant to § 207 of the National Housing Act, 12 U.S.C. § 1713. As a condition of guaranteeing the mortgages, HUD required the Landlord to sign a regulatory agreement which allows HUD to control the Landlord's activities as to "rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment." 12 U.S.C. § 1713(b)(2).

In 1969 the New York City Rent Stabilization Law and Rent Stabilization Code ("rent control laws") became effective and Birchwood Towers joined the Rent Stabili-zation Association and became subject to those laws. At that time, apparently in order to comply with HUD's regulatory agreement, the Landlord put into all leases for apartments at Birchwood Towers a rider which provided that should HUD approve or require a rental charge greater than that approved or required by the CAB under the local rent control laws, the tenant would pay the federally approved rental immediately.

On November 4, 1974, the Landlord applied to CAB for hardship rent increases allowable under § 43 of the Rent Stabilization Law of the City of New York. Under Chapter XIII of that law if the tenants wish to contest the landlord's application, they have an opportunity to submit forms showing "any incorrect matter or items contained in the owner's application." R.S.L. Chap. XIII 2. At this point if "there are many tenants involved who are making the complaint or claim, or if the factual situation is very involved, the CAB may determine a hearing is necessary." R.S.L. Chap. XIII 1. *See also Rules of the Conciliation and Appeals Board* promulgated October 10, 1969.

In this case, since the Landlord's application, the CAB has requested various information from the Landlord, but there is some dispute whether the Landlord has fully complied with those requests and thus whether their application for the hardship increase was ever complete. In any case, as of the date of this opinion the CAB has not granted the Landlord any increase in rent.

On February 6, 1975, the Landlord filed an application for rent increases with HUD. On July 23, 1975, HUD approved rent increases so that the annual rental for Birchwood Towers would be $3,795,104. The maximum permitted under CAB regulations was $3,256,288. On September 9, 1975, the Landlord requested CAB to issue the necessary orders to permit the Landlord to collect the HUD approved rents.

On October 22, 1975, HUD adopted a regulation concerning the authority of local rent control laws over HUD projects. 24 C.F.R. § 403 (1975). That regulation pro-

vides in relevant part that "HUD will pre-empt the regulation of rents for such projects when the Department determines that the delay or decision of a board, or other authority regulating rents pursuant to state or local law, jeopardizes the Department's economic interest in the project." 24 C.F.R. § 403.5 (1975).

In order for Landlord to have HUD pre-empt the local rent control laws under the above regulation, the Landlord must file an application for increases in rent with HUD and notify the local board, in this case the CAB, of that application. If the local board does not act within 30 days and HUD determines that the delay will jeopardize the Department's interest in the guaranteed mortgager, HUD issues "a formal certification that it has pre-empted local rent controls as to such rents in order to protect the Department's economic interest in the project. Copies of the certification shall be transmitted to the mortgagor, the local HUD office, the Regional Office, and the board." 24 C.F.R. § 403.6(e). Nowhere in this pre-emption process are the tenants of the HUD projects allowed any opportunity to be heard.

On May 7, 1976, the Landlord requested HUD to issue a certificate of pre-emption pursuant to 24 C.F.R. § 403. On May 26, 1976, HUD advised CAB that it was imperative that CAB render a decision on the Landlord's hardship application or HUD would consider issuing certificates of pre-emption for Birchwood Towers.

On June 29, 1976, CAB advised HUD that the Landlord had not completed his application for hardship increases and further (letter from CAB to HUD, June 29, 1976):

"in the event the owner qualifies for a comparative hardship increase under the provisions of the Rent Stabilization Law, the rent increase granted the owner in any hardship order would be collectible in an amount not exceeding 6% in any one year (above guidelines) with any balance due the owner collectible in succeeding years at a rate similarly not exceeding 6%. Moreover, the Rent Stabilization Law limits the owner to no more than

one hardship order in any 36 month period."

On September 1, 1976, HUD issued the certificates of pre-emption and beginning on November 1, 1976, the Landlord sought to collect the HUD approved increases both from tenants signing new leases and, by way of the pass through rider discussed above, from tenants who had unexpired leases as of November 1, 1976.

On October 19, 1976, the Tenants filed the complaint in this action seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that HUD's pre-emption order was void, and seeking to enjoin the Landlord from collecting the increased rents approved by HUD pursuant to 5 U.S.C. § 701, et seq.

Next, both sides filed orders to show cause returnable November 5, 1976, requesting preliminary injunctions. On November 5 and again on November 12 this Court heard extensive oral argument and then reserved decision. In order to maintain the status quo, on November 12, 1976, this Court signed an order consented to by both sides requiring that the plaintiffs pay to their lawyers as escrow agents the difference between the current lease rental or the CAB guidelines rental and HUD approved rents pending the Court's decision in this matter. This order also provides that should the HUD approved rents eventually be upheld, notwithstanding any lease then in effect, the tenants shall have the right to vacate the premises.

I

The first issue before the Court is the plaintiffs' argument that HUD's pre-emption of local rent control was invalid because the pre-emption regulation, 24 C.F.R. § 403 (1975) goes beyond HUD's Congressionally delegated powers. Due to the recent promulgation of that regulation, the only case that has decided that issue is City of Boston v. Hills, 420 F.Supp. 1291 (D.Mass.1976), which held that this regulation was consistent with statutory authority and was a necessary and reasonable means

of carrying out that authority. Except as modified by our due process analysis below, we adopt the reasoning and conclusion of that case on this point.

## II

The plaintiffs further argue that even if the regulation was valid, it was improperly invoked in this case because there was no real conflict between local rent control laws and HUD's rent increases because the Landlord could have achieved the needed increases under the rent control laws. This position is not supported by the facts. First, the Landlord applied to CAB for hardship rent increases in 1974 and has received no action over two years later. Plaintiffs argue that this is because the Landlord has not completed his application to CAB, but the Landlord disputes this. Assuming, however, that the Landlord has not completed his application, there is still a conflict, as CAB admits in its letter of June 29, quoted above, that the maximum allowable increase the Landlord could receive under the Rent Stabilization Law in any one year was 6%. HUD had already authorized a much greater increase than that, and so if HUD, after the due process procedures described below, decides again in favor of pre-emption, then the regulation will have been validly invoked.

## III

The plaintiffs argue that even if local rent control is properly pre-empted, the new rents can only apply to tenants whose leases have expired. The Landlord argues that the pass through rider he inserted in leases in 1969 allows him to pass on to all tenants any HUD approved rent increases. The tenants argue that this type of pass through provision is invalid under local rent control laws. We do not need to decide that issue because if HUD validly pre-empts local rent control, the leases are no longer governed by those laws. Thus, if HUD validly pre-empts the local rent control laws, the Landlord may pass on any HUD authorized increases to tenants with existing leases, with the limitation that as

provided in this Court's order of November 12, 1976, all tenants shall have the option to vacate the premises.

## IV

The last and most difficult question presented by this case is whether HUD can validly pre-empt local rent control and then allow the imposition of HUD authorized rent increases without affording the tenants who have to pay those increases due process of law. This due process question is best broken down into a three step analysis as follows: (1) is there sufficient government involvement to invoke the due process clause; (2) is the tenants' interest in not having HUD pre-empt the local rent control laws and then increase their rents a constitutionally protected "property interest"; and if so (3) what procedural safeguards does due process require to protect that interest. *See Geneva Towers Tenants Org. v. Federated Mortgage Inc.*, 504 F.2d 483 at 487 (9th Cir. 1974); Note, Procedural Due Process in Government-Subsidized Housing, 86 Harv.L.Rev. 880 (1973).

In the leading Supreme Court cases in the area of the due process clause, the issue of sufficient government involvement has not even arisen as it was clear from the facts that the government had acted.

Thus in *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), welfare benefits were being cut off under federal and state programs, and in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a state college was firing teachers. Further, the courts have had no trouble finding government involvement where the state is owning or operating the housing project. *Burr v. New Rochelle Municipal Housing Authority*, 479 F.2d 1165 (2d Cir. 1973); *Escalera v. New York City Housing Authority*, 425 F.2d 853 (2d Cir.), *cert. denied*, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); *Caulder v. Durham Housing Authority*, 433 F.2d 998 (4th Cir. 1970), *cert. denied*, 401 U.S. 1003, 91 S.Ct. 1228, 28 L.Ed.2d 539 (1971). The problem

arises here because of the nature and structure of the National Housing Act and its amendments. These amendments during 1960's provided for federally subsidized rental housing programs and were passed "in response to growing dissatisfaction with the results that had been achieved by conventional public housing programs; the hope was that private, profit motivated parties could build and operate housing more effectively than the public housing bureaucracies, which were accused of rigidity and inefficiency." Note, Procedural Due Process in Government Subsidized Housing, *supra*, at 883. *See Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 301 (2d Cir. 1971).

The federal subsidies took several different forms. Among the more important were the § 221(d)(3) below market interest rate mortgage program, 12 U.S.C. § 1715*l*(d)(3), the § 236 interest reduction payments program, 12 U.S.C. § 1715z–1, the § 202 direct loans at below market interest rates program, 12 U.S.C. § 1701q, and a "Rent Supplement Program", 12 U.S.C. § 1701s, which allows HUD to make direct payments to the landlords of projects involved in the above programs so that eligible low income individuals and families can afford the rentals of those projects. Finally, there is the program involved in this case, the § 207 program, 12 U.S.C. § 1713, which allows HUD to guarantee the mortgages of projects.

The leading cases in this Circuit involving these programs and the due process clause are *Langevin v. Chenango Court, Inc.*, 447 F.2d 296 (2d Cir. 1971), and *Grace Towers Tenants Assoc. v. Grace Housing Development Fund Co., Inc.*, 538 F.2d 491 (2d Cir. 1976). *Chenango Court* involved a § 221(d)(3) program where the government had authorized the landlord to increase rents without any due process guarantees to the tenants. The Second Circuit held that because HUD had merely "allowed the landlord to institute an increase upon the termination of existing tenancies, as the landlord would have been legally free to do but for its regulatory agreement with the FHA", therefore this was not government action and the due process clause was not involved. *Chenango Court, supra*, at 301.

In *Grace Towers* the project was not only subsidized by a below market interest rate mortgage under § 221(d)(3), but also received rent supplementation payments for 10% of the tenants pursuant to 12 U.S.C. § 1701s. Here again, HUD authorized and the landlord imposed rent increases. The Court did not decide the issue of whether there was sufficient government involvement, but rather held that even if there was, the tenants had "no legitimate claim of entitlement upon which due process protections may attach." *Grace Towers, supra*, at 495. Thus, it is not clear whether the programs in *Grace Towers* constitute sufficient government involvement to invoke due process protection.

In our case, however, the government involvement was through a § 207 program where only the mortgages were guaranteed. Inasmuch as the program is even less intrusive than the § 221(d)(3) program in *Chenango Court* where the government actually subsidizes the mortgages so that they bear below market interest rates, it is clear that the § 207 program standing alone in this case would be insufficient government involvement to invoke due process protection. In fact, this Court has so held in *Klein v. Department of Housing & Urban Development*, 416 F.Supp. 615 (E.D.N.Y. 1976).

■ However, in this case HUD did more than simply "allow" the landlord to raise rents. HUD pre-empted local rent control laws pursuant to 24 C.F.R. § 403 (1975). It is this positive action which distinguishes this case from *Chenango Court* and *Klein*. In fact, the following language from *Chenango Court* seems to say that where there is local rent control and preemption the due process clause is invoked; *Langevin v. Chenango Court, Inc.*, 447 F.2d 296 at 301 (2d Cir. 1971) (emphasis added):

"The due process clause does not forbid Congress from deciding, if it wishes, that federal assistance to 'private industry in providing housing for low and moderate income families and displaced families' in

the form of insurance and purchase of low interest mortgages need not be conditioned on the granting of an evidentiary hearing with respect to rent increases, *but, in the absence of some governmental scheme of rent control, whether general or particularized,* may instead be confided to the decision of the experienced staff of the FHA, which has been instructed to subject rent increase applications to thorough investigation to the end that tenants should not be imposed upon."

Thus, we hold that there was sufficient government involvement here to invoke the due process issue.

The next step in our analysis is whether the tenants' interest in not having HUD pre-empt the local rent control laws and then allowing the Landlord to increase their rents rises to the level of a constitutionally protected "property interest."

The Supreme Court in recent years has greatly expanded the concept of constitutionally protected property. In *Goldberg v. Kelly, supra,* the right to welfare benefits was held to be property. In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), a pupils interest in attending school was held to be property. In *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), the right to a driver's license was given due process protection. Unfortunately the Supreme Court has not ruled on the question of whether the right to low rents in a National Housing Act project is such a right. Some courts have held there was such a right. *Marshall v. Lynn,* 162 U.S. App.D.C. 56, 497 F.2d 643 (1973), *cert. denied,* 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974); *Geneva Towers Tenants Org. v. Federated Mortgage, Inc.,* 504 F.2d 483 (9th Cir. 1974). Other courts have held there was no such right. *Grace Towers, supra; Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir. 1970); *Paulsen v. Coachlight Apartments Co.,* 507 F.2d 401 (6th Cir. 1974); *People's Rights Organization v. Bethlehem Associates,* 356 F.Supp. 407 (E.D.Pa.), *aff'd* 487 F.2d 1395 (3d Cir. 1973).

Our decision, of course, is controlled by the recent Second Circuit opinion in *Grace*

*Towers* to the extent that it applies. The key language in that case is as follows, 538 F.2d at 494 (quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548) (emphasis added):

"These tenants could not reasonably expect that they were to be forever immunized from rent increases; nor, could they legitimately expect an opportunity to participate in a decision-making process which Congress confided to the experienced discretion of the Secretary. Without at least some Congressionally prescribed restrictions on the agency's action *or a practice giving rise to a legitimate expectation,* we are constrained to find that plaintiffs' interest in the benefit of low-cost housing does not rise above 'an abstract need or desire for it . . . .' "

As our case involves only § 207 guarantee of mortgages which is less intrusive than the programs in *Grace Towers,* we must hold that there was no property interest involved here unless this case fits into the exception spelled out in the emphasized language above. This language of a "practice giving rise to a legitimate expectation", presumably is derived from the Supreme Court cases of *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), and *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth* the Supreme Court held that a non-tenured teacher who had not been rehired did not have a sufficient property interest in continued employment to invoke due process. In *Sindermann* the Court held that a non-tenured teacher could invoke due process protection because "the respondent claimed legitimate reliance upon guidelines promulgated by the Coordinating Board of the Texas College and University System that provided a person, like himself, who had been employed as a teacher in the state college and university system . . . some form of job tenure." *Sindermann, supra,* 408 U.S. at 600, 92 S.Ct. at 2699. The distinguishing characteristic between *Roth* and *Sindermann* was that the teacher in *Sindermann* legitimately relied on guide-

lines, and thus had the expectation that he would not be fired without due process being followed.

Similarly, in this case the tenants had legitimately relied on the Rent Stabilization Law and had the expectation that their rents would not be increased without the procedures provided for in that law being followed. To use the words of the Second Circuit, the procedures provided for in the Rent Stabilization Law were "a practice giving rise to a legitimate expectation", *Grace Towers, supra*, at 494. Therefore, when HUD pre-empted the local rent control laws, it destroyed the tenants reliance on those laws and shattered their legitimate expectation that the procedures provided for would be followed before their rents were increased. Therefore we hold that HUD could not pre-empt the Rent Stabilization Law without providing the tenants with due process protections.

Having held that due process was invoked here, we come to the third step in our analysis, namely, what procedural safeguards does due process require in this case. In cases involving rent increases such as this one, the Second Circuit has held that full adversary-type hearings are not required. *Burr v. New Rochelle Housing Authority*, 479 F.2d 1165 (2d Cir. 1973); *see Grace Towers, supra*, at 495. Rather, what is required is a balancing of HUD's interest in having a summary procedure against the interest of the tenants in disputing the landlord's application for pre-emption. Further, this Court is aware that the purpose of the National Housing Act amendments was "to promote 'the construction of housing by private enterprise'", *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 301 (2d Cir. 1971). Thus there appears to be no basis for overly burdening HUD and the private landlord with extensive procedures so that private enterprise will be discouraged from investing in these projects. In reaching the proper balance we note that in response to the decisions of a number of Circuits that due process was required in raising rents at various National Housing Act projects, HUD has promulgated a regulation, 24 C.F.R. 401 (1975), that provides for some due process protections before rents can be increased under certain programs including the § 221(d)(3) programs involved in *Chenango Court* and *Grace Towers*. Unfortunately this regulation does not apply to the § 207 program involved here for then this whole controversy might never have arisen.

In any case, we find in § 401 some evidence of what HUD finds not unduly burdensome. Under that section the landlord must notify the tenants thirty days before applying for rent increases and during that time the tenants can inspect the landlords application and material in support thereof and submit written comments on the proposed increases to HUD. No oral presentation is provided for. This result is similar to the plan laid down in *Burr v. New Rochelle Municipal Housing Authority*, 479 F.2d 1165, 1170 (2d Cir. 1973), where the Court held as follows:

"Notice of a proposed increase in rent shall be served well in advance of the date for the increase. Opportunity for filing written objections shall be given. There need be no opportunity for oral presentation. The tenants or their representatives shall have the right to submit any material they consider relevant to disprove the need for the rent increase. Finally, the Review Board upon reaching a decision shall issue a statement outlining the reasons for either approving or rejecting the requested rent increase. The tenants may of course be represented by counsel."

A similar result has been reached by several courts. *See Caramico v. Secretary of H.U.D.*, 509 F.2d 694, 701–702 (2d Cir. 1974); *Keller v. Kate Maremount Foundation*, 365 F.Supp. 798 (N.D.Cal.1972), *aff'd* 504 F.2d 483 (9th Cir. 1974).

In reliance on *Burr* and *Caramico* we find that in order for HUD to pre-empt the local rent control laws involved here and to allow rent increases, it must give the tenants an opportunity to inspect the landlord's application and to submit to HUD written objections or reasons why HUD

should not pre-empt local rent control and any material in support thereof. After considering these submissions, HUD shall, in a written decision, outline why pre-emption is necessary or unnecessary.

If HUD finds that pre-emption is unnecessary then the money being held by the escrow agents shall be returned to the tenants who paid it. On the other hand, if HUD finds pre-emption necessary, then the escrow agents shall pay the money to the landlord. *Keller v. Kate Maremount Foundation*, 365 F.Supp. 798, 804 (N.D.Cal.1972), *aff'd* 504 F.2d 483 (9th Cir. 1974); *Ponce v. Housing Authority of County of Tulare*, 389 F.Supp. 635, 656 (E.D.Cal.1975). Further, if HUD finds pre-emption necessary, then the tenants shall pay the HUD authorized increases with the option contained in this Court's Order of November 12, 1976, to vacate the premises. In the meantime, that Order remains in effect.

Finally, the landlord also moves for dismissal of the plaintiffs' sixth and seventh causes of action and for an order under F.R.C.P. 23(b)(1)(A) so that this action will be maintained as a class by all the tenants of Birchwood Towers. Our decision on the due process issue should be dispositive of this case so we do not reach the question of dismissing the sixth and seventh causes of action.

■ As for the class action motion, the Landlord has requested class action treatment under Rule 23(b)(1)(A) which provides for class action where there is the risk of inconsistent verdicts. However, it is not clear that such a risk exists, but the Court does think that this is a proper class under 23(b)(3). The Court is aware of the suggestion in the Manual for Complex Litigation § 1.401 (1975) that suits for determination of the constitutionality of a federal statute or regulation should not be treated as a class action. *Compare Ihrke v. Northern States Power Co.*, 459 F.2d 566, 572 (8th Cir. 1972), *with Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972), and *Hammond v. Powell*, 462 F.2d 1053 (4th Cir. 1972). However, as this case also involves the issues of whether there is in fact a conflict between the HUD authorized rents and the CAB authorized rents and whether the pass through rider in the leases were valid, the class action method would appear to be a superior method for handling this action. Therefore, the Court makes the following findings: the class of tenants in this case is so numerous that joinder of all members is impracticable, there are questions of law and fact common to the class, the claims and defenses of the representative parties are typical if not identical with the class, and the representative parties will fairly and adequately protect the interests of the class. Also the Court finds that the common questions of law and fact predominate over any individual claims and that a class action is the superior method for a fair and efficient adjudication of the controversy. The class shall be defined as tenants of the Birchwood Towers from September 1, 1976 to the date of this opinion. For a similar result with similar facts and findings in another tenants suit, *see Ponce v. Housing Authority of the County of Tulare*, 389 F.Supp. 635 (E.D.Cal.1975).

Since it is the Landlord who has requested the class action, they must submit, for approval, to this Court within two weeks a proposed notice to the class members which should include the requirement of Rule 23(c)(2)(A), that the class members can request exclusion within 30 days of service. Further, the Landlord shall, within 2 weeks of this Court's approval of the notice to class members, serve all class members with that notice.