**515 ASSOCIATES, a limited partnership and Mt. Prospect Associates, a limited partnership, plaintiffs,**

v.

**CITY OF NEWARK and Rent Leveling Board of the City of Newark, Defendants,**

and

**Joseph Worth et al., Intervenors.**

**Civ. A. No. 75–2194.**

United States District Court, D. New Jersey.

Jan. 12, 1977.

986

Sills, Beck, Cummis, Radin & Tischman by Clive S. Cummis, Newark, N.J., for plaintiffs.

Milton A. Buck, Corp. Counsel by Anthony Ambrosio, Asst. Corp. Counsel, Newark, N.J., for the City of Newark.

Frank E. Catalina, Newark, N.J., for intervenors.

Jonathan L. Goldstein, U. S. Atty. by Carolyn E. Arch, Asst. U. S. Atty., Newark, N.J., for the United States.

## OPINION

STERN, District Judge.

The center of this controversy is the conflict between the United States Department of Housing and Urban Development (HUD) and the Newark Rent Control Board over the regulation of rental rates in two Newark apartment houses. Plaintiffs are landlords who own and operate the buildings. They filed suit to challenge actions taken by the Newark Rent Control Board. The Board twice denied plaintiffs' applications for an increase in rental rates. Plaintiffs contend that HUD has preempted the authority of the Newark Rent Control Board to regulate rents in their buildings. They seek an injunction barring the City of Newark or its agencies from interfering with their efforts to raise rents. HUD has been joined as a nominal party plaintiff; several tenants have been granted leave to intervene.[1] The landlords and HUD have now moved for summary judgment.

At issue is the power of HUD to preempt local rent control of non-subsidized

---

1. The procedural history of this lawsuit is somewhat complex. Plaintiff landlords filed suit against the City of Newark on December 19, 1975, seeking to enjoin the City from interfering with the implementation of HUD-approved rental levels. Less than two weeks

housing projects subject to HUD-held or HUD-insured mortgages, and the manner in which such power may be exercised. For the reasons set forth below, the Court holds

that the HUD preemption regulations, 24 C.F.R. §§ 403.1 et seq. (1976),[2] are a valid exercise of the agency's rulemaking authority, that they do preempt the Newark Rent

after the complaint was filed, the City consented to entry of an order for a permanent injunction. No approval had been obtained from the Newark City Council prior to the entry of this order.

In February 1976, Joseph Worth, Thomas Corbally, James Judge and Charles Kavenaugh, tenants of the buildings, moved for leave to intervene, individually and as representatives of all of the buildings' tenants. The motion was granted on March 22. On March 25, the City of Newark itself moved to vacate the consent order and, in a reversal of its prior position, for leave to file a third-party complaint against HUD. In April, by consent of all parties, the United States and the Secretary of HUD were joined as nominal party plaintiffs. HUD has filed a complaint seeking an adjudication declaring the Newark rent control ordinance void as applied to these projects and enjoining its enforcement.

Now pending before this Court, in addition to plaintiffs' motions for summary judgment, is the motion of defendant City of Newark to vacate the consent order. Counsel for the City of Newark contends that, at the time he consented to the order for a permanent injunction, he was unaware that an ordinance of the City of Newark prohibits corporation counsel from compromising or settling claims against the City without the approval of the City Council. See Revised Ordinance of the City of Newark 2:6–5 (1966).

Rule 60(b) of the Federal Rules of Civil Procedure provides:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order or proceeding for . . . (1) mistake, inadvertence, surprise, or excusable neglect, . . . or (6) any other reason justifying relief from the operation of the judgment.

Although the Court has been unable to find any authority directly on point, it is clearly within the Court's discretion to vacate the consent order under the circumstances of this case. No prejudice can be shown. The Court has permitted the tenants to intervene and thus must reach the underlying legal issues on the merits. Plaintiffs' motion for summary judgment, now pending before the Court, permits prompt resolution of those issues. The order will be vacated. See Freeman v. McCarthy, 153 F.2d 1001 (3rd Cir. 1946) (a party may obtain relief under Rule 60(b) from an order taken against him as the result of a stipulation or admission made by his attorney in excess of his limited authority and without the knowledge of his client); cf. McGinn v. United States, 2 F.R.D. 562 (D.Mass. 1942) (motion under Rule 60(b) time barred,

but common law relief granted where motion to dismiss had been granted upon assent of plaintiff's counsel but without plaintiff's authority); Preveden v. Hahn, 36 F.Supp. 952 (S.D.N.Y.1941) (same).

2. The full text of the regulations at issue follows:

§ 403.1 Scope and effect of regulations.

(a) The regulation of rents for a project coming within the scope of "Subpart B—Unsubsidized Insured Projects" is preempted under these regulations only when the Department determines that the delay or decision of the local rent control board, or other authority regulating rents pursuant to state or local law (hereinafter referred to as board) jeopardizes the Department's economic interest in a project covered by that subpart. The regulation of rents for projects coming within the scope of "Subpart C—Subsidized Insured Projects" is preempted in its entirety by the promulgation of these regulations. The regulation of rents for projects coming within the scope of "Subpart D—HUD-Owned Projects" rests within the exclusive jurisdiction of the Department.

(b) Any state or local law, ordinance, or regulation is without force and effect insofar as it purports to regulate rents of (i) projects for which a determination of preemption has been made pursuant to Subpart B, or (ii) projects coming within the scope of Subpart C or D. Compliance with such law, ordinance, or regulation shall not be required as a condition of, or prerequisite to, the remedy of eviction, and any law, ordinance, or regulation which purports to require such compliance is similarly without force and effect.

(c) It is the purpose of the Department that these regulations shall bar all actions of a board that would in any way frustrate the purpose or effect of these regulations or that would in any way delay, prevent or interfere with the implementation of any increase in rental charges approved by HUD.

(d) These regulations may be offered as a defense to a proceeding by whomever initiated, which may be brought or threatened to be brought against any owner, mortgagor or managing agent of a project subject to these regulations who demands, receives or retains, or seeks to demand, receive or retain, rental charges approved by HUD, or as a basis for declaratory, injunctive or other relief against any person or agency, public or private, who attempts to enforce, or threatens to enforce, any state or local law, ordinance, or regulation which is without force and effect by reason of this regulation.

Control ordinance as applied to the projects in issue, but that due process requires that tenants be given notice and an opportunity to be heard before the agency exercises its power to preempt.

Most of the facts which gave rise to this lawsuit are not in dispute. Plaintiffs 515 Associates and Mt. Prospect Associates are New Jersey limited partnerships. They presently own and operate highrise apartment buildings located at 515 and 555 Mt. Prospect Avenue in Newark. Both buildings were constructed in the mid-nineteen-

sixties, pursuant to § 207 of the National Housing Act, Title 12 U.S.C. § 1713 (1969).

Section 207 established a program of federal mortgage insurance to facilitate the construction of rental accommodations for families. This program, which represents the major federal commitment to non-subsidized housing, is designed to serve the housing needs of a broad spectrum of citizens by stimulating private mortgage lending. See 1950 U.S.Code Cong.Serv., 81st Cong., 2nd Sess. pp. 2026, 2038. Projects constructed under § 207 must meet numerous govern-

.    .    .    .    .    .

Subpart B—Unsubsidized Insured Projects
§ 403.4 Applicability.

This subpart applies to all projects with mortgages insured or held by HUD, except those to which Subpart C applies.
§ 403.5 Rental charges.

The Department will generally not interfere in the regulation by a local rent control board (hereinafter referred to as board) of rents for unsubsidized projects with mortgages insured or held by HUD. However, HUD will preempt the regulation of rents for such a project when the Department determines that the delay or decision of a board, or other authority regulating rents pursuant to state or local law, jeopardizes the Department's economic interest in the project.
§ 403.6 Procedures.

(a) The mortgagor shall file its application for approval of increases in rental charges with the appropriate local office of HUD, and simultaneously therewith file an application for approval of those increases with any board in the area in which the project is located. The mortgagor shall also notify the board in writing that it has submitted an application to HUD for approval of the increases which may be affected by the provisions of the regulations in this subpart.

(b) The local HUD office will process the application for increases in rental charges in accordance with HUD's instructions and procedures promulgated in accordance with the authority contained in the National Housing Act.

(c) The mortgagor shall inform the local HUD office if the rents approved for the project by the board are lower than those approved by HUD, or if the board fails to render a decision on the mortgagor's application for increases in rental charges within a period of thirty (30) days following the filing of the application. The mortgagor shall furnish the local HUD office with any data supplied to the board not previously furnished to the local HUD office, and, if the mortgagor

considers that the economic interest in the project is jeopardized by the decision or delay of the board, a statement to that effect together with the reasons therefor.

(d) The local HUD office will review the information submitted by the mortgagor, together with the decision of the board, if any, and shall make a report if it deems the delay or decision of the board jeopardizes the Department's economic interest in the project and the board will not modify its position to the satisfaction of the local HUD office. The report shall be sent to the Office of Loan Management in the Central Office (hereinafter referred to as Office of Loan Management) and shall include appropriate recommendations concerning the action that should be taken by HUD. A copy of the report and recommendations shall be furnished the Regional Office.

(e) The Office of Loan Management will review the report and will consider whether to approve rents higher than those approved by the board, or to approve a rent increase notwithstanding the failure of the board to reach a decision on the application. If the decision of the Office of Loan Management is to approve (1) rents higher than those approved by the board, or (2) a rent increase notwithstanding the delay of the board in reaching a decision, it shall issue a formal certification that it has preempted local rent controls as to such rents in order to protect the Department's economic interest in the project. Copies of the certification shall be transmitted to the mortgagor, the local HUD office, the Regional Office, and the board.

(f) The mortgagor may effect collection of the HUD approved rents after the expiration of 30 days notice to the tenants, subject to whatever rights a tenant may have under his lease.

ment requirements. See 24 C.F.R. §§ 207.1 *et seq.* (1976).[3] When the mortgagor, the mortgagee and the project have satisfied the conditions of eligibility, HUD undertakes to insure virtually the entire principal amount of the mortgage loan. See 24 C.F.R. § 207.259 (1976). Once this commitment is made, HUD oversees the mortgagor's business operations, 24 C.F.R. § 207.-19(f) (1976), and regulates the rents and charges made by the mortgagor. 24 C.F.R. § 207.19(e) (1976).

Despite the careful regulation of § 207 mortgage insurance commitments, neither project at issue here proved to be economically viable. The original owners-mortgagors fell into default and the government was called upon pursuant to the mortgage insurance contracts to satisfy the mortgage debts. HUD did so, paying the insurance proceeds to the mortgagees, in exchange for assignment of the notes and mortgages. Subsequently, HUD acquired the buildings by foreclosure.[4]

The funds which HUD may use to satisfy the claims of insured mortgagees under § 207 come from the General Insurance Fund created by § 519 of the National Housing Act, Title 12 U.S.C. § 1735(c) (1970). This fund is intended to operate as a self-sustaining source of monies for vari-

ous National Housing Act programs, including § 207. In order to achieve this goal of a self-sufficient housing program, the Secretary of HUD is authorized to manage, sell, or sell for credit properties acquired by foreclosure ". . . for the protection of the interests of the General Insurance Fund." Title 12 U.S.C. § 1713(*l*). In the instant cases, the Secretary determined that continued HUD ownership of the buildings was not desirable. Accordingly, both buildings were offered for sale in 1973.

The offering was made by means of a prospectus and invitation to bid. The prospectus for each building noted that the purchaser was obliged to execute a standard regulatory agreement with HUD providing for ". . . the customary controls, including rent." [5] During the period that HUD had owned the two buildings directly, no rental increases had been imposed. In each case, the prospectus offered HUD approval of maximum rental rates in excess of the prevailing rental levels. Any further increases, however, were to be processed normally according to HUD procedures.[6] Plaintiffs here were the high bidders on each project. They executed the required Regulatory Agreements embodying the provisions of 24 C.F.R. §§ 207 *et seq.* and closed the transactions in the latter part of 1973.[7] HUD took back a purchase

---

**3.** Location, design, financing and sponsorship must be approved by HUD. In addition, the project must be designed and located ". . . . so as to effect a substantial improvement of housing standards and conditions in the neighborhood." 24 C.F.R. § 207.24(b) (1976).

**4.** The mortgagor of 555 Mt. Prospect Avenue fell into default shortly after construction was completed. The insured private mortgagee elected to recoup most of its investment under the § 207 mortgage insurance contract. The mortgagee therefore assigned its interest in the note and mortgage to HUD. In return for the assignment, HUD paid the mortgagee some $3,211,950 in insurance claims. In 1967 HUD acquired title to the property by foreclosure sale. See Title 12 U.S.C. § 1713 (1970). A similar fate befell the developers of 515 Mt. Prospect Avenue. The mortgagor of 515 defaulted while the building was still under construction. The insured mortgagee completed construction before assigning its note and mortgage to HUD in return for $3,367,575 in

§ 207 insurance proceeds. HUD acquired title to the project by foreclosure sale in 1970.

**5.** When a HUD-held building is sold, the controls that are applied to the original mortgagor are explicitly continued in the case of the purchaser. See HUD Handbooks RHM 4360.1 Supp. 1 at 6, and 4350.1, ch. 4, § 3, 1–9.

**6.** The relevant regulations provide that, in passing upon applications for changes, the agency consider (1) rental income necessary to maintain the economic soundness of the project, and (2) rental income necessary to provide reasonable return on the investment consistent with providing reasonable rentals to tenants. 24 C.F.R. § 207.19(e) (1976). See n.17 *infra.*

**7.** The Secretary took back a purchase money mortgage on 555 Mt. Prospect Avenue in the amount of $2,337,361.80, and on 515 Mt. Prospect Avenue in the amount of $2,075,000. In the case of each building the total purchase

money mortgage on each of the buildings in substantial amounts.

The conflict which engendered the present lawsuit was created by the enactment, in December 1973, of a rent control ordinance by the City of Newark.[8] The ordinance, which by its terms was made retroactive to November 1973, applied to plaintiffs' newly acquired buildings. The ordinance permitted no more than a five percent increase in rental rates in any year. Because of the passage of this ordinance, the plaintiffs were unable to implement the increases in rental rates contemplated by the bid prospectuses and approved in advance by HUD. Section 9 of the Newark ordinance provided that a landlord could apply to the newly created Newark Rent Control Board for a hardship increase. Although § 10 of the ordinance created the Rent Control Board, the group did not constitute itself until November 1974.

During the year that the ordinance was in effect without a functioning Rent Control Board, plaintiffs were in serious financial difficulty. Debt service on HUD's purchase money mortgages had been calculated on the assumption that the increases in rental rates contemplated by the bid prospectuses would be implemented. When the increases were blocked by the enactment of the Newark ordinance, plaintiffs defaulted on their mortgage payments. HUD entered into Provisional Work-Out Agreements with respect to each of the buildings. Under these agreements, HUD approved a two-year moratorium on the repayment of principal and the payment of interest, from May 1, 1974 to April 1, 1976, subject to any change in the financial conditions of the projects.

The Newark Rent Control Board constituted itself in late 1974. In February of

1975, plaintiffs made simultaneous application to HUD and the Board for permission to raise their rents in an amount significantly greater than five percent. Plaintiffs were heard by the Newark Rent Control Board on February 28, 1975. Despite a provision of the Rent Control Ordinance which required that the Board make its decision within 15 days of the hearing, plaintiffs' applications pended until April 25, 1975, at which time their applications for increased rental levels were denied for failure to "substantiate hardships." On the advice of HUD, plaintiffs thereupon reapplied simultaneously to HUD and to the Newark Rent Control Board. These applications were filed on July 30, 1975. Again approval from HUD came within days. The Newark Board held no hearings until October 23, 1975, despite a provision of the Rent Control Ordinance requiring that any such hearings be held within 60 days of the filing of such an application.

While this second application was pending before the Newark Rent Control Board, plaintiffs applied to HUD to have the agency act pursuant to interim regulations which permitted HUD to assert exclusive jurisdiction over rentals where " . . . the action or inaction of a local rent control board jeopardizes HUD's economic interest in a project."[9] Final regulations were published on October 22, 1975,[10] and formal certificates of preemption were delivered to the Newark Rent Control Board one week later. In accordance with the preemption certificates, plaintiffs notified their tenants that rents would be increased. On December 5, 1975, the Newark Rent Control Board released its decision, again denying plaintiffs' applications for increased rentals. The Board's decision did not refer to the Certificate of Preemption served a month earlier. The Board did, however, send let-

---

price was less than the amount of insurance claims paid by more than one million dollars. Affidavit of Fred W. Pfaender, Director of the Office of Loan Management, Department of Housing and Urban Development, June 30, 1976, ¶¶ 19–21.

**8.** Revised Ordinances of the City of Newark, 15:9B–1 *et seq.* (Supp.1975).

**9.** 40 Fed.Reg. 8189 (1975).

**10.** 40 Fed.Reg. 49318 (1975), 24 C.F.R. §§ 403.1 *et seq.* (1976). The full text of these regulations is set forth at n. 2 *supra.*

ters to all tenants in the two buildings notifying them of the Board action and thus suggesting that the increased rentals need not be paid. On December 19, 1975, plaintiffs filed the instant suit against the City of Newark.

This lawsuit involves the validity of the effect of the HUD regulations, 24 C.F.R. §§ 403.1 *et seq.* (1976), which permit the Secretary to preempt local rent controls as they apply to § 207 unsubsidized, insured housing projects upon a determination that a local rent control board's delay or decision "jeopardizes the Department's economic interest in a project."

■ The validity of the regulations must be tested by a three-fold inquiry: (1) Are the rules within the delegated authority? (2) Are the rules reasonable? (3) Were the rules issued pursuant to proper procedures? See Kenneth Culp Davis, Administrative Law Treatise, § 5.05 (1958). No attack has been made on the procedure by which the regulations were promulgated. If reasonable and within the delegated power, the regulations are valid.

■ The reasonableness of the rent control preemption regulations is plain. Congress has enacted a comprehensive statutory scheme designed to implement its general policy objectives in the housing field. Among these objectives is the creation of additional dwelling units in order to alleviate the housing shortage and to make available housing which the public can afford. Central to the Congressional scheme, and underlying the § 207 program, is the determination that these goals should be achieved through utilization of the financial resources of the public sector. Section 207 mortgage insurance is designed to implement that Congressional determination.

Federal mortgage insurance, however, creates a direct governmental interest in the financial well-being of the projects insured. In addition to this clear financial interest, HUD also has an interest in insuring the fulfillment of the goals of the National Housing Act. Accordingly, HUD seeks to insure that it can attract private capital for and private involvement in the provision of housing units. It has determined that it can do so by protecting the private mortgagee from the mortgagor's default and by insuring the private mortgagor a fair rate of return on his investment. The regulations here at issue reflect the agency's determination that, under some circumstances, local rent control laws have interfered with the landlord's revenues in such a way that his ability to meet his mortgage payments is jeopardized.[11] Under the regulations, upon deeming it necessary, HUD may preempt local rent control and itself exercise exclusive jurisdiction over the regulation of rents. In light of the structure of the § 207 housing program, it simply cannot be said that the establishment of rental levels and the preemption of local rent control ordinances when they conflict with the rentals established is an unreasonable means of maintaining the economic viability of § 207 projects, of protecting the economic interests of the government, and of encouraging subsequent private investment.

These regulations are within the Secretary's statutory authority. Title 42 U.S.C. § 3535(d) provides that the Secretary of HUD may make such rules and regulations as may be necessary to carry out her functions, powers, and duties. Among these is the duty to make regulations which are necessary to carry out the provisions of the Mortgage Insurance Act. See Title 42 U.S.C. §§ 3531 *et seq.;* Title 12 U.S.C. § 1715b. The Mortgage Insurance Act, in turn, itself empowers the Secretary to insure mortgages and to regulate or restrict mortgagors *with respect to rents* or sales, charges, capital structure, rate of return, and method of operation *to such extent and in such manner as to provide reasonable*

---

11. HUD maintains that, although there are many factors which contribute to mortgage defaults, local rent control ordinances are "a significant factor in causing owners of FHA projects . . . . to default on their mortgage payments and to lose interest in project ownership." Moreover, according to HUD, local rent controls, unlike such factors as tax structures and high utility costs, are amenable to HUD control. See 40 Fed.Reg. 49318 (1975).

*rentals to tenants and a reasonable rate of return on the investment.* Title 12 U.S.C. § 1713(b)(2). (Italics not in original).

Despite the explicit language of the statute, the defendants urge that the statutory grant of authority to the Secretary does not encompass the power to make rules which preempt otherwise valid state or local laws. On this precise issue, the legislative history is not enlightening. Although the Court cannot lightly infer a Congressional intent to clothe an administrative agency with the power to alter the delicate state-federal balance by preempting ordinances enacted pursuant to the state's police power, the unambiguous language of the statute and the expressed purposes of the Act compel the conclusion that the regulations here at issue are properly within the rulemaking authority granted to the Secretary.[12]  See *Glasco v. Hills,* 412 F.Supp. 615 (D.N.J.1976); *Druker v. Boston,* 410 F.Supp. 1314 (D.Mass.1976); *City of Boston v. Carla Hills,* 420 F.Supp. 1291 (D.Mass.1976); *Edgemere at Somerset v. Johnson,* 143 N.J.Super. 222, 362 A.2d 1250 (Dist.Ct., Somerset Cty., 1976).

**12.** Congressional intent to permit agencies to preempt state law by rulemaking has been found on many occasions in other contexts. See, *e. g., Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (FAA regulations); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962) (treasury regulations); *Public Utilities Comm'n v. United States,* 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958) (procurement regulations). Although the regulations at issue here are somewhat unique in permitting an exercise of administrative discretion on the question of whether to preempt or not, the Court does not deem this fatal to the regulation. The agency has simply chosen a means of fulfilling its mandate which is somewhat less intrusive than an across-the-boards preemption.

**13.** The process is not a purely mechanical one. Deciding whether a state statute or local ordinance is in conflict with a federal statute and hence invalid under the Supremacy Clause is essentially a two-step process. First, the Court must ascertain the construction of the two statutes; then, it must determine the constitutional question whether they are in conflict. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

In the instant case, however, the resolution of these two questions is relatively simple. The HUD preemption certificate does not mere-

■ Having found the regulations valid, the Court must consider their effect in the context of this case. This issue need not detain the Court long. It is well-established that a regulation by a department of government addressed to and adapted to the enforcement of an Act of Congress, the administration of which is confided to such department, has the force and effect of law. *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). Article VI, Clause 2 of the Constitution of the United States provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Court's determination that the regulations are valid coupled with the operation of the Supremacy Clause inexorably lead to the conclusion that the Newark Rent Control ordinance must yield.[13]

ly set a maximum rental level. In the final preemption regulations, the phrase "increase in rental charges" was substituted for the phrase "maximum permissible rents" to make it clear that HUD processes a request for increases in rental charges to determine the minimum rents necessary to assure payment of debt service, return on investment and operating expenses. See 40 Fed.Reg. 49318 (1975); *Druker v. City of Boston,* 410 F.Supp. 1314 (D.Mass.1976); compare *Columbia Plaza Limited Partnership v. Cowles,* 403 F.Supp. 1337 (D.D.C.1975) (interim rule). The Certificates of Preemption issued pursuant to the regulations mandate action forbidden by state law. This case thus presents a clear and direct conflict. Although the relative importance to the State of its own law vis-a-vis the federal interest in the federal statutory scheme may be a factor in preemption cases which require the Court to determine whether Congress intended to "occupy the field", see, *e. g., New York State Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), this inquiry is irrelevant where, as in the instant case, there is a direct conflict between state and federal law. The relative importance to the State of its own law is not material; the Framers of our Constitution provided that the federal law must prevail.

The tenant-intervenors argue, however, that the Secretary's decision to preempt, absent notice to the tenants of the projects and an opportunity for them to be heard, violates the procedural due process protections guaranteed by the Fifth Amendment.

■ For more than a century, the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 68 U.S. (1 Wall.) 223, 233, 17 L.Ed. 531 (1863); *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). But resolution of the issue whether the tenants herein have been denied due process requires consideration of several factors. First, is there sufficient governmental involvement to bring the case within the due process clause of the Fifth Amendment? Second, do the tenants have a constitutionally protected liberty or property interest? Third, if the tenants do have a constitutionally protected interest, what procedural safeguards are required to protect it? See *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ It cannot be gainsaid that the action of the Secretary in issuing a preemption certificate is governmental action. It is precisely the federal government's authority, insured by the Supremacy Clause of the Constitution, which permits the preemption of the otherwise valid and applicable local rent control law.[14]

It is equally clear that the tenants have a constitutionally protected "property" interest in the protections afforded to them by the Newark Rent Control ordinance. See *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Although the range of constitutionally protected property rights is not yet clear, the United States Supreme Court, in *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), has delineated certain attributes of property interests.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance

See *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). See generally, Note, The Preemption Doctrine: Shifting Perspectives on Federalism and the Burger Court, 75 Colum.L.Rev. 23 (1975).

Defendants' reliance on *Helmsley v. Borough of Fort Lee,* 362 F.Supp. 581 (D.N.J.1973); *Stoneridge Apts. Co. v. Lindsay,* 303 F.Supp. 677 (S.D.N.Y.1969); and *Druker v. Sullivan,* 334 F.Supp. 861 (D.Mass.1971), *aff'd* 458 F.2d 1272 (1st Cir. 1972), is misplaced. These cases were decided prior to the promulgation of the final regulations involved in the present action. The cited cases were concerned only with *maximum* rental levels established by HUD which did not present conflict with local regulations.

14. Thus, at least for purposes of resolving the issue of governmental involvement, this case is clearly distinguishable from that line of cases which holds that tenants in federally subsidized housing projects do not have Fifth Amendment rights to notice and an opportunity to be heard prior to HUD *approval* of rental increases. *Harlib v. Lynn,* 511 F.2d 51 (7th Cir. 1975); *Paulsen v. Coachlight Apartments Co.,* 507 F.2d 401 (6th Cir. 1974); *People's Rights Or-*

*ganization v. Bethlehem Associates,* 356 F.Supp. 407 (E.D.Pa.), *aff'd* 487 F.2d 1395 (3rd Cir. 1973); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2nd Cir. 1971); *Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir. 1970). In each of these cases the governmental involvement was limited to HUD *approval* of rental increases, required by the Regulatory Agreements between the landlord and HUD, where such rent increases would otherwise have been within the sole discretion of the private landlord who had no duty himself to grant a hearing to his tenants. The present controversy concerns a governmental exercise of discretion which initiates rent increases for individuals by suspending other laws passed for their benefit. Indirect governmental involvement sufficient to invoke the protections of the due process clause might also be found in the role of HUD as insuror, mortgagee, and regulator of the projects. See *Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974); Note, Procedural Due Process in Government Subsidized Housing, 86 Harv.L. Rev. 880 (1973).

that must not be arbitrarily undermined. . . . Property interests, of course, are not created by the Constitution. Rather, *they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.*

(Emphasis added). Although the constitutionality of this particular ordinance has not been tested, it seems plain that the Newark rent control ordinance is a valid exercise in municipal lawmaking. See *Inganamort v. Borough of Fort Lee,* 62 N.J. 521, 303 A.2d 298 (1973). It creates a legitimate claim of entitlement in a very basic and most important area of human concern and consequently, a property interest protected by the Fifth Amendment's [15] guarantee of procedural due process.[16]

▮ Once a constitutionally protected interest is recognized, the law recognizes that *some* procedural protection is required. A balancing of interests, however, must be undertaken to determine precisely what procedure is due. The Court must therefore weigh the importance of the interests jeopardized, and the appropriateness of the requested procedure in protecting those interests, against the costs of requiring the procedure. See *Morrissey v. Brewer,* 408 U.S. 471, 481–90, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Bell v. Burson,* 402 U.S. 535, 539–42, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Goldberg v. Kelly,* 397 U.S. 254, 263–71, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Note, Procedural Due Process in Government Subsidized Housing, 86 Harv.L.Rev. 880, 891 (1973).

The interest of these tenants in procedural safeguards is substantial. They seek to retain decent housing at a price they can afford to pay. They seek the benefit of laws passed by their local government for their benefit and for the express reason that there is a housing emergency in Newark. Under the HUD regulations, tenants are completely without bargaining power. They must either pay the increases or move. Thus, they also seek to insure that any rent increases imposed are truly justified by all the relevant data. They seek to insure, before the procedural protections embodied in the Newark rent control ordinance are totally eliminated by HUD, that such a step is actually necessary to protect the interests of the federal government.

The decision to preempt, though purportedly based on the sole criterion that HUD's economic interest in a project is being jeopardized, is obviously a decision to set rental levels higher. Rent determination for § 207 housing projects is based in significant part upon various technical factors, but also on concepts of "reasonable rentals" for tenants and "reasonable return on the investment" for the landlord.[17] It is difficult to compre-

---

**15.** Although *Board of Regents v. Roth, supra,* and its companion case, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), addressed the question of procedural due process under the Fourteenth Amendment, the tests enunciated therein have been deemed applicable in the Fifth Amendment context. See *Arnett v. Kennedy,* 416 U.S. 134, 151–52, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

**16.** Clearly, on the issue of the existence of a protected property right, this case is distinguishable from the cases which have held or intimated that tenants do not have a protected property interest in a particular rental level. See, *e.g., Hahn v. Gottlieb,* 430 F.2d 1243 (1st Cir. 1970); *Langevin v. Chenango Court, Inc.,* 447 F.2d 296 (2nd Cir. 1971); *People's Rights Organization v. Bethlehem Associates,* 356 F.Supp. 407 (E.D.Pa.), aff'd (3rd Cir. 1973); *but see Geneva Towers Tenants Organization v.*

*Federated Mortgage Investors,* 504 F.2d 483 (9th Cir. 1974) (tenants in federally subsidized § 221(d)(3) housing project have a legitimate, objectively justifiable claim that they will continue to receive the benefits of low cost housing.) Each of these cases arose in the context of rental increases in the absence of a rent control ordinance.

**17.** See 24 C.F.R. § 207.19(e) (1976). HUD rent increase procedures for unsubsidized housing projects are found in HUD Handbook 4350.1, Chapter 4, Section 3. Where HUD is the mortgagee as a result of a sale of HUD-owned property and the taking back of a purchase money mortgage, HUD Handbook HM 4350.1, Supp. I, Chapter 2, also applies. In all cases, HUD considers the following factors in passing upon changes in rentals: (1) rental income necessary to maintain the economic soundness of

hend why such determinations should be made on *ex parte* presentations by landlords, especially when the decision necessarily depends on the quality of the housing provided as against market conditions in the area. In fixing rents the agency must also consider whether increased expenses have occurred and whether unnecessary expenses have been minimized, for the agency will only entertain rent increase applications when justified by expenses "over which owners have no effective control." [18]

The basic interests of both landlords and tenants are affected by the resolution of these questions as to which tenants and landlords are likely to have widely different perspectives. These are matters, experience tells us, which are best decided, and perhaps can only be fairly decided, after hearing from *both* sides. Tenants are in an excellent position to contribute facts relevant to the various considerations which by law must enter into the rent determination decision. In the instant case, for example, the intervenors contend that an audit report by the HUD Regional Inspector General for Audit indicates that the landlords improperly expended project funds.

Of course, the government's interest in its ability to decide promptly to preempt or not is also substantial. The government has a direct financial interest in protecting its position as mortgage insuror or mortgagee. The government has an additional interest in preserving the flexibility of the mortgage insurance program, for if the pro-

gram becomes encumbered with bureaucratic obstacles, private investment in the area may be deterred.[19]

However, this Court finds that these government interests are not sufficient to outweigh entirely the need—and helpfulness—of permitting tenants a limited right of intervention. There is no apparent need to completely stifle any right of theirs to be heard. While a full-dress hearing may not be necessary, for the potential for lengthy delay if such a hearing precedes a preemption decision is great, considering the number of tenants involved,[20] the government may not simply extinguish local rent control laws and itself impose rent increases on tenants on nothing more than the *ex parte* application of a landlord who is indebted to the government. We have moved beyond that time when government will assist landlords in imposing unilateral and *ex parte* rental charges.

Under these circumstances, some notice and opportunity to be heard must be given to tenants before the government subjects them to rents unlawful under a local ordinance. The Court therefore holds that due process requires that tenants be given (1) notice before the filing of an application under 24 C.F.R. § 403.6 for a rent increase, (2) a reasonable opportunity to inspect materials sent to HUD in support of the application, (3) a reasonable opportunity to submit written comments to HUD, and (4) a written statement from HUD setting forth the reasons for the decision with respect to

---

the project; and (2) *rental income necessary to provide reasonable return on the investment consistent with providing reasonable rentals to tenants.*

**18.** Applications for rent increases may be made "to compensate for any net increases, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance costs *over which owners have no effective control.*" (Regulatory Agreement, ¶ 14 [emphasis added]).

**19.** See *Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483, 491 (9th Cir. 1974).

**20.** Courts have consistently distinguished the specific requirements of procedural due proc-

ess where *individualized* determinations are being made (suspension or revocation of licenses, termination of statutory benefits to individuals, dispossession of property) from those cases where a class of individuals is being affected. In the former, full dress adjudicative hearings—replete with cross-examination, discovery and inspection of evidence—are deemed necessary to the airing of the critical questions. In the latter, more limited participation has been deemed adequate. See, *e.g., Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165, 1168–70 (2nd Cir. 1973); *Thompson v. Washington,* 162 U.S.App.D.C. 39, 497 F.2d 626, 640–41 (1973).

preemption.[21]  The Court recognizes that circumstances will vary from case to case. Accordingly, it will defer in the first instance to HUD's administrative expertise. The agency will be afforded an opportunity to formulate specific procedures, including appropriate time schedules, consistent with this opinion.  For the reasons expressed, the Court grants partial summary judgment to the plaintiffs on the issue of preemption, but remands for further administrative proceedings in which tenants will be afforded the procedural due process rights which the Court has determined are their due.[22]

---

**21.**  *Cf.* 24 C.F.R. §§ 401 *et seq.* (1976).  (Notice to Tenants and Consideration of their Comments in Effecting Rent Increases in Certain Subsidized Projects); 24 C.F.R. §§ 410.71 *et seq.* (1976) (low-rent public housing management); *Geneva Towers, supra; Bloodworth v. Oxford Village Townhouses, Inc.,* 377 F.Supp. 709 (N.D.Ga.1974); *Dew v. McLendon Gardens Associates,* 394 F.Supp. 1223 (N.D.Ga.1975); *Thompson v. Washington,* 497 F.2d 626 (D.D.C.

1973); *Marshall v. Lynn,* 162 U.S.App.D.C. 56, 497 F.2d 643 (1973).

**22.**  In light of this decision, it is unnecessary at this time to address tenant-intervenors' assertion of a right to judicial review of the agency's decision to preempt.  Tenant-intervenors' motion to file a complaint against HUD appears to be mooted and, thus, will be denied.