CITY OF BOSTON et al., Plaintiffs,
Appellees,

v.

Patricia HARRIS, etc. et al.,
Defendants, Appellees,

Marion Hart et al., Plaintiffs-Intervenors,
Appellants.

No. 79–1122.

United States Court of Appeals,
First Circuit.

Argued Sept. 10, 1979.

Decided March 17, 1980.

---

3. The Commonwealth is mistaken in saying that, apart from Hudson, there was evidence at trial that he had been drinking.

Jeffrey M. Winik, Boston, Mass., with whom Hollis Young and Bruce Mohl, Boston Mass., were on brief, for appellants.

Anthony J. Steinmeyer, Washington, D.C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D.C., Edward F. Harrington, U. S. Atty., Boston, Mass., Ronald Glancz and Barrie L. Goldstein, Attys., Civil Division, Dept. of Justice, Washington, D.C., were on brief, for appellees.

Before KUNZIG,* Judge, U. S. Court of Claims, CAMPBELL, Circuit Judge, and DOOLING,** Senior District Judge.

PER CURIAM.

This case presents for the first time the question of whether new Department of Housing and Urban Development (HUD)

---

* Sitting by designation.

** Of the Eastern District of New York, sitting by designation.

regulations governing housing subsidized under the National Housing Act, 48 Stat. 1246, June 27, 1934 (now codified at 12 U.S.C. §§ 1701–1750g (1976)) validly preempt local rent control regulation. Unlike those considered in a long line of past cases, the newly promulgated HUD regulations which we must consider, 24 C.F.R. §§ 403.1, 403.8, *et seq.* (1979), specifically preempt *all* local rent control laws as applied to federally subsidized insured projects.[1] We hold that the HUD regulations were validly promulgated and thus operate through the Supremacy Clause, U.S.Const. Art. VI, cl. 2, to preempt local rent control regulations in these instances. We also conclude that HUD procedures and regulations satisfied the tenants' due process rights.

## BACKGROUND

The rental housing which both parties seek to regulate in this case is federally insured subsidized units developed under the National Housing Act (NHA), 12 U.S.C. §§ 1701 *et seq.* (1976). The general purpose of federal housing regulation has been to meet the national goal of a "decent home and a suitable living environment for every American family." 12 U.S.C. § 1701t (1976); 1968 U.S.Code Cong. & Admin. News, pp. 2873, 2877. In order to achieve its goal, Congress has elected to utilize the financial resources and expertise of the private sector rather than to develop projects itself. *See* S.Rep.No. 281, 87th Cong., 1st Sess. 3 (1961). The NHA programs administered by HUD are intended to stimulate the development of low and moderate income housing by providing subsidies or insured mortgages designed to lower the cost of building a project and thus lower the rent which owners must charge to make a fair return on their investments. The rental housing which the City of Boston purports to regulate involves four HUD programs combining insured mortgages and subsidized rents.

The first of these four programs, section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (1976), allows HUD to make 3% loans for 50 year terms [2] to eligible developers [3] to provide housing facilities for elderly or handicapped families [4] with inadequate income to pay private market housing rentals. To start the program Congress set up

1. 24 C.F.R. § 403.1(b) provides,
   "Any state or local law, ordinance, or regulation is without force and effect insofar as it purports to regulate rents of . . . projects coming within the scope of Subpart C [subsidized insured projects] . . . . Compliance with such law, ordinance, or regulation shall not be required as a condition of, or prerequisite to, the remedy of eviction, and any law, ordinance, or regulation which purports to require such compliance is similarly without force and effect."
   24 C.F.R. § 403.9 provides, in material part "[T]he Department concludes that it is in the national interest to preempt, and it does hereby preempt, the entire field of rent regulation by local rent control boards . . . . ."

2. Section 202, 12 U.S.C. § 1701q(a)(3) (1976), provides as follows:
   "(3) A loan under this section may be in an amount not exceeding the total development cost (as defined in subsection (d)(3) of this section), as determined by the Secretary, except that in the case of other than a corporation, consumer cooperative, or public body or agency the amount of the loan shall not exceed 90 per centum of the development cost; shall be secured in such manner and be repaid within such period, not exceeding fifty

years, as may be determined by him; and shall bear interest at a rate which is not more than a rate determined by the Secretary of the Treasury taking into consideration the average interest rate on all interest bearing obligations of the United States then forming a part of the public debt, computed at the end of the fiscal year next preceding the date on which the loan is made adjusted to the nearest one-eighth of 1 per centum, plus an allowance adequate in the judgment of the Secretary to cover administrative costs and probable losses under the program."
The three percent interest rate is provided by 24 C.F.R. § 277.6 (1979).

3. 12 U.S.C. § 1701q(a)(2) (1976); 24 C.F.R. § 277.3 (1979). Limitations are also placed on the type of project. 12 U.S.C. § 1701q(a)(2) (1976); 24 C.F.R. § 277.4 (1979). Construction cannot be extravagant but rather economical and create a pleasant environment. Nursing homes, hospitals and religious facilities are ineligible. *Id.*

4. Elderly and handicapped families are defined by the statutes and regulations. 12 U.S.C. § 1701q(d)(4) (Cum.Supp.1979); 24 C.F.R. § 277.1(f)–(g) (1979).

a revolving fund, *id.* at § 1701q(a)(4), which depends upon repayment of mortgages or Congressional appropriations for its continued success. Section 202 makes money available for mortgages which is otherwise unavailable. *Id.* at section 1701q(a)(2)(A). In order to insure that section 202 objectives are met, HUD requires an applicant to enter into a regulatory agreement providing that the Secretary of HUD shall establish rental levels and tenant eligibility.[5]

The second of these four programs, NHA sections 221(d)(3), 12 U.S.C. § 1715*l*(d)(3) (Supp. II 1978), and (5), 12 U.S.C. § 1715*l*(d)(5) (1976), establishes a subsidized mortgage program. Section 221(d)(3) assists "private industry in providing housing for low and moderate income families and displaced families." *Id.* at section 1715*l*(a). As Chief Judge Coffin explained in *Hahn v. Gottlieb*, 430 F.2d 1243, 1245 (1st Cir. 1970):

"This assistance to the private sector takes two forms. First, the FHA provides insurance on long-term mortgage loans covering up to 90 per cent of the project's cost, thus encouraging private investment in projects which would otherwise be too risky. Second, eligible borrowers can obtain below-market interest rates on FHA-insured loans, thus reducing the rentals necessary to service the landlord's debt obligations. 12 U.S.C. § 1715*l*(d)(5)."

*Id.* at 1245.

Again, Congress provided the Secretary with broad discretion to manage and control the rental housing. *Id.* at 1246. HUD is authorized to control rents and operation through a regulatory agreement, although the Secretary may defer to other federal or local law. 12 U.S.C. § 1715*l*(d)(3) (Supp. 1978).[6] While a project owner may apply for rent increases, the Secretary controls the determination and strict limitations are placed on the permissible return on investment.[7] Once more, defaults on mortgages directly cause the mortgagee to draw upon the insurance fund. 12 U.S.C. § 1715*l*(g).

A third program, section 236 of the NHA, 12 U.S.C. § 1715z–1 (1976), is designed to encourage private enterprise to develop rental and cooperative housing for lower income families and provide periodic subsidy payments to the mortgagee which effectively reduced the interest payments on the mortgage to 1% on qualified rental housing. 12 U.S.C. § 1715z–1(c) (1976). The Secretary is expressly directed by Congress to

---

5. 24 C.F.R. § 277.8 (1979) reads:

"Prior to loan disbursement, an applicant is required to enter into a regulatory agreement with the Secretary under which the applicant shall agree (a) to establish rentals approved by the Secretary, (b) to limit occupancy of the project to elderly or handicapped families in accordance with occupancy criteria approved by the Secretary, including prescribed income limits, (c) not to rent any portion of the project for transient or hotel use, and (d) to provide a governing board and management acceptable to the Secretary."

6. Section 1715*l*(d)(3) requires a mortgagor to be

"regulated or supervised under Federal or State laws or by political subdivisions of States, or agencies thereof, or by the Secretary under a regulatory agreement or otherwise, as to *rents*, charges, and methods of operation, in such form and in such manner as in the opinion of the Secretary will effectuate the purposes of this section." (Emphasis added.)

7. 24 C.F.R. § 221.531(c) provides:

". . . In approving the allowable rents and charges and in passing upon applications for changes, consideration will be given to the following and similar factors:

(1) Rental income necessary to maintain the economic soundness of the project.

(2) Rental income necessary to provide a reasonable return on the investment consistent with providing reasonable rentals to tenants."

The regulatory agreement provides that:

(d) The Commissioner will at any time entertain a written request for a rent increase properly supported by substantial evidence and within a reasonable time.

(1) Approve a rental schedule that is necessary to compensate for any net increase, occurring since the last approved rental schedule, in taxes (other than income taxes) and operating and maintenance cost over which owners have no effective control, or

(2) Deny the increase stating the reasons therefor."

Federal Housing Administration Form No. 3254A (Nov. 1964).

establish rental charges.[8] The Secretary may also enter into regulatory agreements and establish necessary rules and procedures. *Id.* at section 1715z–1(h) (1976).

The final program here involved is a Rent Supplement Program (RSP), 12 U.S.C. § 1701s (1976), which empowers the Secretary to make annual payments on behalf of eligible low income families or individuals unable to afford section 221(d)(3) rents.[9] The maximum payment which the Secretary can make for an eligible tenant is that amount by which the rent approved by the Secretary exceeds 25 percent of the tenant's income. *Id.* at section 1701s(d).

In examining these four programs it becomes apparent that their success "requires a flexible exercise of administrative discretion." *Hahn v. Gottlieb*, 430 F.2d 1243, 1246 (1st Cir. 1970). Moreover, Congress has granted the Secretary broad general rule making authority for the NHA [10] and again in each specific section.[11] For project sponsors, the rent received from tenants provides the major source of income from which to maintain the housing and meet the debt service requirements. Although the Secretary originally permitted local governments to operate their rent control programs freely, the Secretary nonetheless engaged extensively in the regulation of rent in HUD insured and subsidized projects through leases and regulatory agreements. In order to increase the rents for units in the project, a landlord must submit a request and justification to HUD.[12] Rental increases are only permissible for justifiable increased costs and, in general, HUD allows a landlord to receive a six percent return on equity. *Kargman v. Sullivan*, 552 F.2d 2, 4 (1st Cir. 1977).

While Congress was coping with rental housing problems through the NHA, local government concerned with spiraling rents began imposing direct limits on the amount of rent which a landlord could charge. One of the earliest programs of local rent control was that instituted by the City of Boston in 1970, ch. 797, 1969 Mass.Acts, as amended, ch. 863, 1970 Mass.Acts. Originally initiated under statewide local option rent control legislation, the city itself adopted a comprehensive regulatory scheme upon the expiration of the statewide legislation in 1975. Ch. 15, City of Boston Ordinances (1975). Since 1972, privately owned, federally insured and subsidized sections 202, 221(d)(3) and (5) and 236 housing had been covered by Boston's rent control. *See City of Boston v. Hills*, 420 F.Supp. 1291 (D.Mass.1976), *reconsidered and reversed by district court*, 461 F.Supp. 1201 (D.Mass. 1978). Under the local legislation, the City of Boston's rent control legislation sets maximum rents for covered projects. The basic rent established under the 1975 ordinance is that which was previously established in 1970 or 1972.[13] Generally, those

---

8. Congress has directed that the Secretary establish rents as follows:

> "For each dwelling unit there shall be established with the approval of the Secretary (1) a basic rental charge determined on the basis of operating the project with payments of principal and interest due under a mortgage bearing interest at the rate of 1 per centum per annum; and (2) a fair market rental charge determined on the basis of operating the project with payments of principal, interest, and mortgage insurance premium which the mortgagor is obligated to pay under the mortgage covering the project. The rental for each dwelling unit shall be at the basic rental charge or such greater amount, not exceeding the fair market rental charge, as represents 25 per centum of the tenant's income."

*Id.* at section 1715z–1(f). This provision is further explained in 24 C.F.R. § 236.55 (1979).

9. Eligibility for projects, housing owner, and tenants are set forth in 24 C.F.R. §§ 215.10– 215.20 (1979).

10. 42 U.S.C. § 3535(d) (1976).

11. 12 U.S.C. § 1701q(b) incorporating § 1749a(c)(1) (Section 202 Program); 1701s(f) (Rent Supplement Program); 1715*l*(b) (Section 221(d)(3) & (5) Program); 1715z–1(h) (Section 236 Program).

12. *See, e. g.*, Fed. Housing Admin. Form No. 3254A ¶ 7(d).

13. Ch. 15, § 3, 1975 City of Boston Ordinances. That paragraph provides:

> "*Maximum Rent.* The maximum rent of a housing accommodation shall be the rent which was established under Chapter 842 of the Acts of 1970, and section 13(a) of Chap-

base rents were the 1968 rent of the unit or first rent in effect thereafter.[14] The Board is authorized to adjust the established maximum rent upon the petition of either the tenant or landlord.[15] Adjustments are allowable to remove hardships or correct inequities. The governing principle is to maintain maximum rents at levels which will yield landlords a fair net return on operating income from the rental unit. In determining whether a landlord is receiving a fair yield on net operating income, the

Board is directed to consider the effect of property taxes, operating and maintenance expenses, capital improvements, depreciation, and increases or decreases in living space or housing services.[16] Finally, the Board may deny an increase to the landlord if the housing does not satisfy local codes.[17]

While Boston's procedure for setting maximum rents has similarities to HUD's rent setting formula, we have previously noted that differences exist. *Kargman v. Sullivan*, 552 F.2d 2, 5 (1st Cir. 1977).

ter 19 of the Ordinances of 1972. If the maximum rent has not otherwise been established, it shall be established by the board. Any maximum rent may be subsequently adjusted under the provisions of sections 5 and 6."

14. The ch. 11, § 3, 1970 City of Boston Ordinances established base rents for rental units as the December 1968 rent or first rent established thereafter. It provided, however, that rentals could be increased if necessary to yield a fair net operating income to the landlord. Downward adjustments were also possible. The section reads:

"SECTION 3. *Adjustment of Rents.*

[T]he board shall have power to set the rent at a level equal to the base rent, as defined in this section, adjusted upward or downward in conformity with the provisions of this section.

(a) Base Rent. The base rent shall be the rent in effect on December 1, 1968, or, if there was no rent in effect on that date, then the first rent in effect thereafter; or any adjusted rent last established in conformance with chapter 10 of the ordinances of 1969 provided, however, that if the landlord can demonstrate that said rent was insufficient to yield a fair return on the property as of said date, the board shall set as the base rent such higher amount as would have been necessary to *yield a fair net operating income to the landlord on that date.*" (Emphasis added.)

In 1972, the City of Boston's regulation carried over those rents set by the 1970 legislation. Ch. 19, §§ 3, 13, 1972 City of Boston Ordinances. Those sections provided:

"SECTION 3. *Maximum Rent.* The maximum rent of a housing accommodation subject to this ordinance shall be the rent charged the occupant for the month of December, 1972. * * * If the maximum rent is not otherwise established, it shall be established by board. Any maximum rent may be subsequently adjusted under the provisions of sections 5 and 6.

"SECTION 13. *Transitional Provisions.*

(a) * * * Chapter 11 of the Ordinances of 1970 shall expire on December 31, 1972, as

set forth in Section 12 thereof; provided that any maximum rent established under said Chapter 11 by board order or by notice as provided in Section 4 of said Chapter 11 shall remain in effect * * *."

As noted, note 13, *supra*, these rents were carried over in 1975.

15. Ch. 15, § 6(a), 1975 City of Boston Ordinances.

16. The statutory framework is set up in section 5, *id.*:

"SECTION 5. *Adjustment of Maximum Rent.*

(a) *Individual and General Adjustments.* The board shall, by order or regulation as provided in section 6, make such individual or general adjustments, either upward or downward, of the maximum rent established by section 3 for any housing accommodation or any class of housing accommodations as may be necessary to remove hardships or to correct other inequities, and in so doing, shall observe the principle of maintaining maximum rents for housing accommodations at levels which will yield to landlords a fair net operating income from such housing accommodations.

(b) *Fair Net Operating Income.*

In determining whether the maximum rent for housing accommodations yields a fair net operating income, the board shall consider the following among other relevant factors:

· (i) increases or decreases in property taxes;

(ii) unavoidable increases or any decreases in operating and maintenance expenses;

(iii) capital improvement of the housing accommodations as distinguished from ordinary repair, replacement and maintenance;

(iv) increases or decreases in living space or housing services; and

(v) substantial deterioration of the housing accommodations, other than ordinary wear and tear, or failure to perform ordinary repair, replacement or maintenance."

17. *Id.* at section 6(b).

Nevertheless, this circuit decided that no such actual, impermissible conflict existed between local regulation and the NHA provisions as effected preemption. *Id.* at 6, 13–14. *Kargman*, however, specifically left open the question we face here: whether a HUD regulation could preempt local rent control. *Id.* at 6.

As noted, HUD originally left the field open for local rent control of its subsidized insured projects. In 1975, however, HUD promulgated an interim rule, 40 Fed.Reg. 8189 (1975), to deal with the problems it found local rent control was causing. HUD's reasoning was set forth as follows:

"[HUD] has received numerous inquiries relating to the jurisdiction of local rent control boards over FHA projects. This has become an area of great concern to the Department, because it has been determined that local rent control is a significant factor in causing owners of FHA projects, especially subsidized projects, to default on their mortgage payments. The defaults are leading to a substantial number of mortgage insurance claims by mortgagees upon HUD and to the withdrawal from the nation's housing stock of an increasing number of units for low income families. Since HUD already regulates, pursuant to the National Housing Act, the maximum permissible rents that an owner of a project financed by a mortgage insured by HUD may charge, and since each mortgage insurance claim typically requires the expenditure of several millions of dollars by the Department, HUD has an overriding interest to preempt state and local actions which contribute to such claims."

*Id.*

The interim rules were adopted later in 1975 and *bar all local rent control applying to subsidized insured projects.* 24 C.F.R. §§ 403.1, 403.8–403.10 (1979); 40 Fed.Reg. 8189, 8190 (1975). As to unsubsidized housing which HUD insures, local regulation is permitted except where HUD determines that such local control jeopardizes its economic interest in the project. 24 C.F.R. §§ 403.1–403.7; *see also Gramercy Spire Tenants' Association v. Harris*, 446 F.Supp. 814, 821 (S.D.N.Y.1977).

After promulgation of 24 C.F.R. §§ 403.-1–403.10 (1979), the City of Boston filed suit against the Secretary of HUD challenging the constitutionality of HUD's preemptive regulation. Certain tenants of section 202, 221(d)(3) and (5) or 236, rent supplemented housing also intervened as plaintiffs. The City and tenants sought declaratory and injunctive relief, and HUD counterclaimed arguing that Boston's ordinance violated the Supremacy Clause. U.S.Const. art. VI, cl. 2.

The district court, applying *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604, reh. denied, 431 U.S. 925, 97 S.Ct. 2201, 58 L.Ed.2d 240 (1977), stated that "the only determination necessary is whether the express preemption provision promulgated by the Secretary of HUD was authorized by a valid delegation of Congressional authority and properly promulgated pursuant to that delegation." *City of Boston v. Harris*, 461 F.Supp. 1201, 1202 (D.Mass.1978). Since the lower court had earlier determined that HUD's regulations were valid and had the full effect of federal law, *City of Boston v. Hills*, 420 F.Supp. 1291, 1298 (D.Mass.1976), it granted the defendant's motion for summary judgment. 461 F.Supp. at 1203.

Plaintiffs-tenants appealed arguing (1) that the Secretary acted in excess of delegated authority in promulgating 24 C.F.R. §§ 403.1, 403.8–403.10 because Congress never intended to authorize the Secretary to preempt local rent control and (2) that the preemption regulation deprived tenants in federally subsidized insured housing of their entitlement to the protection of rent control without due process. We examine both of these issues in turn.

### I.

In analyzing whether HUD's regulations validly preempt Boston's local rent control ordinance, we start with the obvious fact, conceded by plaintiffs, that HUD's regulations and Boston's local rent control ordinances directly conflict. Indeed, the very

object of the challenged regulations is to provide for the displacement of local rent controls. See text of regulations at note ·1. Thus, the only question remaining is whether the Secretary had the authority to promulgate the regulation.[18]

Plaintiffs place much reliance on *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir. 1977), *reh. denied*, 558 F.2d 612 (1st Cir. 1977). That case, unlike this one, presented no actual conflict between the operation of HUD's subsidized insured housing programs and Boston's rent control for the regulations now challenged—exclusive regulation of rents by HUD—were not then in effect. In large part that case turned upon the burden of proof and evidence presented at a time when the Secretary's own policies were unclear and, indeed, had vacillated. This court was not persuaded on the record then before it that HUD rents were the minimum necessary to ensure project viability. *Kargman v. Sullivan*, 552 F.2d 2, 6–7 (1st Cir. 1977). The court stated that the "mere fact that Boston's rents were lower, does not, of itself, present an impermissible actual conflict with federal law." *Id.* at 7. Because it was not established that Boston's rent regulation caused mortgage defaults in HUD insured projects, the court concluded that the laws could co-exist. The Court specifically noted, however, that

"[T]his is not a case where a national administrator, surveying all of his problems of dealing with local rent control, had concluded that the federal program nationally is jeopardy because of varying approaches to setting rent ceilings, or administrative entanglements, or the risk

that. local regulation would discourage participation in the program." *Id.* at 5.

The very situation stated not to exist in the above quotation now exists. The Secretary has surveyed the situation nationally and has concluded that preemption of local rent control is necessary to protect HUD insured subsidized projects from default. 40 Fed.Reg. 8189 (1975). It can no longer be said that there is no actual conflict between the two schemes of regulation. The Secretary has deliberately framed a regulation creating such a conflict, and the only issue is her power to do so.

The Secretary promulgated the regulations under the authority of 42 U.S.C. § 3535(d) (1976). That section gives the Secretary broad powers under the NHA to "make such rules and regulations as may be necessary to carry out [her] functions, powers, and duties." *Id.* Moreover, as stated earlier, Congress gave the Secretary broad administrative powers over each of the subsidized insured programs. *See* text accompanying notes 2 to 11, *supra*. By virtue of the rent subsidy, direct mortgage loans, mortgage insurance, and interest subsidy programs, the federal government has a very direct interest in and involvement with the financial viability of the housing projects and, therefore, in their rental income.[19] Federal regulation of rents accord the government a voice in securing the economic viability of federally subsidized insured housing. Thus, the Secretary's preemptive regulation, in light of Congress' delegation, is consistent with and advances the purposes of the Act, *see Kargman v. Sullivan*, 552 F.2d at 14 (Campbell, J., concurring),[20] and is therefore valid.[21] *Whirl-*

---

**18.** As *Jones v. Rath Packing Co.*, 430 U.S. 519, 530–31, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), makes clear, an express preemption provision obviates the need to examine whether an actual conflict exists. HUD's regulations do expressly preempt local rent control law. 24 C.F.R. § 403.1 (1979). Thus, if the regulation is a valid exercise of the Secretary's power, it preempts the local law. *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); *Federal Savings & Loan Assn. of Boston v. Greenwald*, 591 F.2d 417, 425–26 (1st Cir. 1979) (bank board regulation preempts state law).

**19.** *Hahn v. Gottlieb*, 430 F.2d 1243, 1247 n. 5 (1st Cir. 1970); *Gramercy Spire Tenants' Assn. v. Harris*, 446 F.Supp. 814 (S.D.N.Y.1977).

**20.** *See also 515 Associates v. City of Newark*, 424 F.Supp. 984 (D.N.J.1977); *Gramercy Spire Tenants' Assn. v. Harris*, 446 F.Supp. 814 (S.D.N.Y.1977), and *Argo v. Hills*, 425 F.Supp. 151 (E.D.N.Y.1977), *aff'd*, 578 F.2d 1366 (2d Cir. 1978), upholding the Secretary's regulations, 24 C.F.R. §§ 403.1–403.6, as applied to unsubsidized insured housing. Under the regulations,

*pool Corp. v. Marshall,* —— U.S. ——, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980) (No. 78–1870) (regulation which furthers purpose of Act and rationally complements statutory scheme is valid).

In promulgating this regulation, there is no dispute that HUD followed the informal rule-making procedures required by federal law. 5 U.S.C. § 553. The Secretary proceeded by adopting an interim rule, based on her experience with insured mortgage claims, decline in housing stock available for low income families, and defaults on mortgage loans and insured mortgages. The rules under challenge were adopted after notice and comment procedure and rested on legislative type findings amply supporting the rule. 40 Fed.Reg. 8189, 49,-318; 5 U.S.C. § 553.

## II.

■ We turn next to plaintiffs' due process argument. In promulgating 24 C.F.R. §§ 403.1–403.10 (1979), HUD examined the housing situation nationally and drafted a rule to deal with a series of problems. In other words, HUD engaged in legislative rule-making rather than in an adjudicatory function. Thus, HUD complied with the necessary due process requirements for this action when it proceeded in conformity with

5 U.S.C. § 553 (1976) which requires public notice and hearing prior to the regulation's promulgation.

The question of what procedural requirements HUD must meet when landlords seek to have their rent increased has been answered before. 24 C.F.R. § 401 (1979) promulgated in response to the District of Columbia Circuit's decision in *Marshall v. Lynn,* 497 F.2d 643 (D.C.Cir.1973), *cert. denied,* 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974), provides for written notice to the tenants, an opportunity to comment and a written response from HUD explaining its actions. This provides sufficient protection of plaintiff's interests. This court previously determined that tenants in subsidized housing were not entitled to an administrative hearing or judicial review of agency decisions on rent increases. *Hahn v. Gottlieb,* 430 F.2d 1243, 1249 (1970). Similarly, several other circuits found that tenants had no due process rights in the adjustment of rents in NHA housing. *Grace Towers Tenants' Association v. Grace Housing Development Fund, Inc.,* 538 F.2d 491 (2d Cir. 1976); *Harlib v. Lynn,* 511 F.2d 51 (7th Cir. 1975); *Paulson v. Coachlight Apartments,* 507 F.2d 401 (6th Cir. 1974); *Langevin v. Chengano Court, Inc.,* 447 F.2d 296 (2d Cir. 1971). Moreover, in those cases which did find that tenants must be accord-

---

unsubsidized insured projects are subject to local rent control until the Secretary determines local control jeopardizes HUD's economic interest in the project and issues a certificate of preemption. The Secretary's authority for and the interest served by preemption are the same in both subsidized and unsubsidized projects.

**21.** In plaintiff's view it is not enough that the Secretary has been granted broad powers to administer the housing programs—including the authority to regulate rents—and that the regulation advances purposes of the housing programs. Plaintiffs argue that when an exercise of regulatory powers would preclude the exercise of traditional police powers, in order for the police powers to be superseded, the agency must demonstrate a clear delegation of power from Congress to preempt the particular aspect of police powers involved. In support of their argument that no such specific congressional intent to authorize the Secretary to preempt local rent control exists, plaintiffs emphasize that the various housing programs, as enacted, did not foreclose but rather invited

and allowed local participation and regulation. It is true that Congress did not expressly declare that federal regulation of subsidized insured housing was intended to preempt local control of rents. *Kargman v. Sullivan,* 552 F.2d 2 (1st Cir. 1977). But the fact that Congress itself did not foreclose local rent control does not indicate it intended to preclude the Secretary from so doing. We think that where, as here, Congress has set up a complex series of programs the success of which "requires a flexible exercise of administrative discretion," *Hahn v. Gottlieb,* 430 F.2d 1243, 1246 (1st Cir. 1970), has allowed for the operation of that flexibility by delegating broad administrative powers, and has expressly granted to the agency the power to deal with the subject embraced by the conflicting local law—here, rents—Congress has authorized the agency to decide whether to override those local laws which, in the agency's reasonably based view, hamper the operation of the federal program. No more explicit statement on the part of Congress, as plaintiffs would require, is necessary.

ed some rights, the courts imposed only nominal notice and hearing requirements now satisfied by HUD's regulations. *Marshall v. Lynn, supra; Geneva Towers Tenants' Organization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974). Consequently, tenants here are assured of due process when their landlord petitions for rental increases. *Accord Gramercy Spire Tenants' Association v. Harris*, 446 F.Supp. 814 (S.D.N.Y.1977); *Argo v. Hills*, 425 F.Supp. 151 (E.D.N.Y.1977), *aff'd*, 578 F.2d 1366 (2d Cir. 1978); *515 Associates v. City of Newark*, 424 F.Supp. 984 (D.N.H. 1977).

*Accordingly, the decision of the district court is affirmed.*

KUNZIG, Judge, concurring:

I concur in the result and opinion of the court and indeed participated fully in the *per curiam.* However, due to the magnitude and importance of this case I wish to add my personal reasoning a bit more in depth as to why the approach taken by the court in analyzing the preemption issue is the correct one.

As the court states, the ultimate issue regarding HUD's preemption of Boston's local rent control is whether the Secretary had the authority to promulgate the regulation. *See* text accompanying note 18 *supra.* Like the majority of the court in *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir. 1977), however, I am concerned with which preemption analysis we should use in light of the multiplicity of Supreme Court cases in this area of law. *Id.* at 10–14.

Since the early case of *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), there have been many cases analyzing the interplay of federal and state law in light of the Supremacy Clause, U.S.Const. art. IV, § 2. In *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), the Supreme Court described three traditional grounds for preemption of state law under the Supremacy Clause: (1) there exists clear evidence that Congress intended to preempt the field, (2) the actual subject matter of the federal legislation demands exclusive federal regulation, or (3) there is an actual conflict between the two schemes of regulation. *Id.* at 141–42, 83 S.Ct. at 1216–17.[1]

This circuit applied the third test presented in *Florida Lime & Avocado Growers* in *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir. 1977). No specific federal statutes or regulations indicated the application of another approach. The court determined that no actual conflict existed between the operation of HUD's subsidized-insured housing programs and Boston's rent control because the court was unconvinced that HUD rents were the minimum necessary to ensure project viability. *Kargman v. Sullivan*, 552 F.2d 2, 6–7 (1st Cir. 1977). It stated that the "mere fact that Boston's rents were lower, does not, of itself, present an impermissible actual conflict with federal law." *Id.* at 7. Because there was no proof presented showing that Boston's rent regulation caused mortgage defaults in HUD insured projects, the court concluded that the laws could coexist. In large part, the

---

1. *Florida Lime & Avocado Growers, id.*, dealt with whether a California statute gauging the ripeness of avocados was constitutional insofar as it excluded federally approved Florida avocados from California. The California statute determined avocado maturity on the basis of oil content. Federal regulations applicable to Florida avocados made no distinction on the basis of oil content. Moreover, Florida avocados often do not meet the California standards until after maturity. Nevertheless, the California statute, the Court held, was not preempted because the two statutes did not actually conflict and there was no indication of a federal intent to occupy the field. *Id.* at 141, 83 S.Ct. at 1216.

*See also Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (no evidence of inevitable collision); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (not an area demanding exclusive federal control); Note, *A Framework for Preemption Analysis*, 88 Yale L.J. 363 (1978). *Cf., Hunt v. State Apple Advertising Comms'n*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) (area of exclusive federal control).

case turned upon the burden of proof and evidence presented. The court specifically left open the question of the effect of a regulation preempting local law. *Id.* at 5.

The question left open in *Kargman* is precisely the issue presented in this case. The Secretary has determined that preemption of local rent control is necessary to protect HUD insured-subsidized projects from default. 40 Fed.Reg. 8189 (1975). Moreover, this issue with which we are faced does not fit neatly into one of the three categories outlined in *Florida Lime, supra.*[2] Rather, the case involves preemptive effect of a federal regulation promulgated under federal law. Consequently, the case is most appropriately analyzed under the relatively modern line of cases dealing with these issues beginning with *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).[3]

*Free v. Bland* considered whether Treasury regulations creating a right of survivorship in United States Savings Bonds pre-empted any inconsistent Texas community property laws. Under the Treasury regulations, when the co-owner of a bond issued to "Mr. or Mrs." dies, the survivor becomes the absolute owner. Mr. Free claimed the full value of the bonds, but Mrs. Free's son and heir claimed one-half community property interest his mother owned by virtue of Texas community property law. The Court found the Treasury regulation preempted local law. In doing so, the Court utilized a two-step approach. First, it determined whether the regulation was a valid federal law. If so, then its second step was to determine whether it conflicted with state law. Assuming a valid federal regulation and a conflict, the federal law prevails. *Id.* at 666, 82 S.Ct. at 1092.

In this case, plaintiffs challenged the validity of the regulation by arguing that the Secretary was without authority to promulgate them and that they were unnecessary and unreasonable. They also argued that HUD must show an actual conflict as the court required in *Kargman v. Sullivan,* 552

**2.** Another rule frequently entering into preemption cases is that where the federal government enters into a field traditionally occupied by the states, greater deference is given to state law. *See Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Since HUD is regulating a landlord-tenant relationship, traditionally a matter of state concern, at first blush it appears that great deference should be provided state law with an increased burden upon defendants to show a federal intent to preempt. This case does not, however, deal with a traditional landlord-tenant relationship. Rather, because of a shortage in low and middle income rental housing, Congress has stimulated the private sector to provide the housing with which we are concerned.

Seemingly, plaintiffs would agree that if HUD owned and operated the projects local governments would be precluded from regulation absent federal permission, U.S.Const. art. IV, § 3, cl. 2; *Gibson v. Chouteau,* 80 U.S. (13 Wall.) 92, 99, 20 L.Ed. 534 (1872). Likewise, these particular landlord-tenant relationships, while not involving complete federal ownership, contain significant incidents of ownership and involvement. *See Hahn v. Gottlieb,* 430 F.2d 1243, 1247 n.5 (1st Cir. 1970); *Gramercy Spires Tenant's Ass'n v. Harris,* 446 F.Supp. 814 (S.D.N.Y.1977). In fact, by definition, these landlord-tenant relationships would not exist but for the federal legislation. Thus, it does not appear that state law deserves special deference because the federal law is not impinging upon an area of traditional state involvement. *Cf. Nat'l League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *New York State Dep't of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

**3.** *Merrill Lynch, Fenner & Smith v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973) (whether New York Stock Exchange rule promulgated under 15 U.S.C. § 78(f) preempted local employee relief law. Federal regulation not designed to exclude state laws); *United States v. Georgia Public Service Commission,* 371 U.S. 285, 83 S.Ct. 397, 9 L.Ed.2d 317 (1963) (General Services Administration regulations prevail over state law); *Campbell v. Hussey,* 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961) (Secretary of Agriculture's regulations prevail over Georgia labeling law); *First Federal Savings & Loan Assoc. of Boston v. Greenwald,* 591 F.2d 417, 425–26 (1st Cir. 1979) (bank board's regulation preempts state law); *Penagaricano v. Allen Corp.,* 267 F.2d 550 (1st Cir. 1959) (FHA programs not susceptible to Puerto Rican repair laws). *See also Confederated Tribes of the Colville Indian Reservation v. Washington,* 591 F.2d 89 (9th Cir. 1979) (Indian tribe regulations may preempt local law).

F.2d 2 (1st Cir. 1977), despite a concession that the regulation actually conflicts with Boston's rent control.

The Secretary promulgated her regulations under the authority of 42 U.S.C. § 3535(d) (1976). That section gives the Secretary broad powers under the NHA to "make such rules and regulation as may be necessary to carry out [her] functions, powers, and duties." *Id.* Moreover, as stated earlier, Congress gave the Secretary broad administrative powers over each of the subsidized-insured programs.

As this Circuit has noted before, the success of these federal programs "requires a flexible exercise of administrative discretion." *Hahn v. Gottlieb,* 430 F.2d 1243, 1246 (1st Cir. 1970). While I do not find an express provision in HUD's enabling legislation providing that the Secretary may preempt local rent control law, it is implicit in the statutory scheme. As other courts reviewing this problem have noted, the NHA, in addition to providing general authority to implement the Act, also requires that rents, charges and methods of operation of subsidized-insured housing be subject to HUD regulation. Note, *HUD preemption of Local Rent Control Ordinances—Tenants Entitled to Due Process Rights,* 30 Rutgers L.Rev. 1025, 1044 (1977) (hereinafter *"Preemption of Local Rent Control"*). Federal regulation of rents can implement the goals of national housing policy by insuring the continued economic viability of federally subsidized-insured housing. Thus, the Sec-

retary's decision, in light of Congress' delegation, is consistent with the NHA.[4] *See Kargman v. Sullivan,* 552 F.2d 2, 14 (1st Cir. 1977) (Campbell, J., concurring).

Plaintiffs also argued that the regulations were unreasonable and unnecessary.

In administering its subsidized and insured projects across the country, HUD has experienced substantial financial difficulties in projects subject to local rent control. Some 55% of the projects in Boston have suffered financial difficulty and had their insured mortgages assigned to HUD for insurance benefits. In New Jersey, sixteen projects in Newark, Atlantic City or Pleasantville required mortgage modification, foreclosure or were in default. *See also 515 Associates v. Newark,* 424 F.Supp. 984 (D.N.J.1977). These experiences and others led the Secretary to conclude that local rent control was a substantial factor in causing mortgage default in subsidized-insured housing. 40 Fed.Reg. 8189 (1977); *Preemption of Local Rent Control, supra* at 1044. HUD also determined that local rent control deterred private industry in further developing subsidized-insured housing. *See 515 Associates v. Newark,* 424 F.Supp. at 991. Finally, the Secretary also examined the prejudicial effects of the local rent control regulations upon its housing projects. Judge Connor analyzed this reasoning in *Gramercy Spire Tenant's Ass'n v. Harris,* 446 F.Supp. 814 (S.D.N.Y.1977). In finding these regulations a valid exercise of the Secretary's powers, he wrote:

---

**4.** This decision that HUD's regulations are within the strictures of the NHA is further buttressed by the same holding of several other courts. Three district court decisions involving federally insured housing in New York and New Jersey held that 24 C.F.R. §§ 403.1–403.9 (1979) were a proper exercise of power under the NHA.

The first case to address this question was *515 Associates v. City of Newark,* 424 F.Supp. 984 (D.N.J.1977). The projects under consideration were unable to meet their mortgage payments and HUD was required to pay. HUD resold the buildings and plaintiffs, who were unable to adjust the rentals as contemplated in the bid prospectus due to local rent control, sought a certificate of preemption. The district court laid out its three-part inquiry as follows: "(1) Are the rules within the delegated authori-

ty? (2) Are the rules reasonable? (3) Were the rules issued pursuant to proper procedures?" *Id.* at 991. It went on to conclude that "the unambiguous language of the statute and the expressed purposes of the Act compel the conclusion that the regulations here at issue are properly within the rule-making authority granted to the Secretary." *Id.* at 992.

Similar results were reached in *Gramercy Spires Tenant's Ass'n v. Harris,* 446 F.Supp. 814 (S.D.N.Y.1977) and *Argo v. Hills,* 425 F.Supp. 151 (E.D.N.Y.1977), *aff'd* 578 F.2d 1366 (2nd Cir. 1978).

Recently, *Snyder v. Axelrod Management Co.,* 471 F.Supp. 308 (S.D.N.Y.1979) stated "[HUD has] congressionally delegated authority to promulgate 24 C.F.R. pt. 403 and that 24 C.F.R. pt. 403 takes precedence over local rent control laws." *Id.* at 312.

Prior to the adoption of the rent control regulation in its final form, the evidence available to HUD suggested that local rent control ordinances threatened, on occasion, seriously to undermine [HUD's interest in mortgagor's continuing solvency]. HUD was informed that annual increase percentages under local rent control regulations often "bore no relationship to the actual costs incurred by a mortgagor in operating and maintaining a residential rental property," and, further, that applications for hardship increases by mortgagors often involved them in cumbersome and time-consuming procedures, with the result that even if an increase was approved, "it was often too late to prevent the project from going into default".

*Id.* at 822; 40 Fed.Reg. 49319 (1975).

On the basis of the evidence which HUD encountered and considered, I cannot find that the regulations promulgated to solve the mortgage default problem were either unnecessary or unreasonable. *Accord, Gramercy Spire Tenant's Ass'n v. Harris, supra; Argo v. Hills,* 425 F.Supp. 151 (E.D. N.Y.1977), *aff'd* 578 F.2d 1366 (2d Cir. 1978); *515 Associates v. Newark,* 424 F.Supp. 984 (D.N.J.1977); *Levin-Sanger-Orange v. Rent Leveling Board,* 142 N.J.Super. 429, 434, 361 A.2d 616, 619 (1976).

Finally, plaintiffs argued that HUD was required to show an actual conflict between its regulations and Boston's rent control laws. While the court reached that result in *Kargman v. Sullivan,* 552 F.2d 2 (1st Cir. 1977), both the *per curiam* and I have noted that the court specifically left open the question we face here where the regulation specifically preempts local law. Moreover, plaintiffs admitted that HUD's regulations purport to occupy the entire field of rent regulation for subsidized-insured housing. Thus, as I analyze *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962), once we have found the regulations to be validly promulgated, they preempt local law since they have the full force and effect of federal law. Consequently, we reach the same destination as the *per curiam* by a somewhat different route.

The question of whether an actual conflict exists between federal and state laws is generally limited to those situations where the federal law fails to state its preemptive effect, *e. g., New York State Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973), or Congress specifically directs an agency to adhere to state law in some instances but potential conflicts arise, *e. g., California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). Neither situation is present here. Rather, the HUD regulations are clear in their intent to preempt local rent control laws. As *Jones v. Rath Packing Co.,* 430 U.S. 519, 530–31, 97 S.Ct. 1305, 1312–13, 51 L.Ed.2d 604 (1977), relied on by the district court and *per curiam,* makes clear, an express preemption provision obviates the need to examine whether an actual conflict exists.

Consequently, after thoroughly considering the relevant Supreme Court doctrine, I come to the same issue that we all reached in the *per curiam* : did the Secretary have the power to promulgate the regulations? Since we find that she did, they validly preempt conflicting local laws.

Accordingly, for all the above reasons, I would affirm the decision of the district court.

